**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1144
_____

CONESTOGA WOOD SPECIALTIES CORPORATION;
NORMAN HAHN; NORMAN LEMAR HAHN; ANTHONY
H. HAHN; ELIZABETH HAHN; KEVIN HAHN,

Appellants

v.

SECRETARY OF THE UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES;
SECRETARY UNITED STATES DEPARTMENT OF
LABOR; SECRETARY UNITED STATES DEPARTMENT
OF THE TREASURY; UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES;
UNITED STATES DEPARTMENT OF LABOR;
UNITED STATES DEPARTMENT OF THE TREASURY
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-12-cv-06744)
District Judge:  Honorable Mitchell S. Goldberg

_____

Argued May 30, 2013

BEFORE: JORDAN, VANASKIE and COWEN,
Circuit Judges

(Filed: July 26, 2013)

Charles W. Proctor, III, Esq. (Argued)
Law Offices of Proctor, Lindsay & Dixon
1204 Baltimore Pike, Suite 200
Chadds Ford, PA 19317

Randall L. Wenger, Esq.
Independence Law Center
23 North Front Street
Harrisburg, PA 17101

        Counsel for Appellants

Michelle Renee Bennett, Esq.
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W., Rm. 7130
Washington, DC 20530

Alisa B. Klein, Esq. (Argued)
Mark B. Stern, Esq.
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W., Rm. 7531
Washington, DC 20530

Counsel for Appellees

Angela C. Thompson, Esq.
P.O. Box 163461
Sacramento, CA 95816

Counsel for United States Justice Foundation
Amicus on Behalf of Appellants

Ayesha N. Khan, Esq.
Gregory M. Lipper, Esq.
Americans United for the Separation of
Church and State
1301 K Street, N.W.
Suite 850, East Tower
Washington, DC 20005

Counsel for Americans United for Separation of
Church and State; Union for Reform Judaism;
Central Conference of American Rabbis;
Hindu American Foundation;
Women of Reform Judaism
Amici on Behalf of Appellees

Travis S. Weber, Esq.
Boyle Litigation
4660 Trindle Road, Suite 200
Camp Hill, PA 17011

Counsel for Democrats For Life of America;

Bart Stupak
Amici on Behalf of Appellants

Mailee R. Smith, Esq.
Americans United for Life
655 Fifteenth Street, N.W.
Suite 410
Washington, DC 20005

> Counsel for Association of American
> Physicians and Surgeons; American Association
> of Pro Life Obstetricians and Gynecologists;
> Christian Medical Association;
> Catholic Medical Association;
> Physicians for Life; National Catholic Bioethics;
> National Association of Pro Life Nurses
> Amici on Behalf of Appellants

Bruce H. Schneider, Esq.
Stroock, Stroock & Lavan
180 Maiden Lane, 38th Floor
New York, NY 10038

> Counsel for American Society for Reproductive
> Medicine; Society for Adolescent Health and
> Medicine; American Medical Women's Association;
> National Association of Nurse Practitioners in
> Women's Health; Society of Family Planning; James

4

Trussell; Susan F. Wood; Don Downing; Kathleen Besinque; American Society for Emergency Contraception; Association of Reproductive Health Professionals; American College of Obstetricians and Gynecologists; Physicians for Reproductive Choice and Health
Amici on Behalf of Appellees

Lisa S. Blatt, Esq.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, DC 20004

Counsel for Center for Reproductive Rights; American Public Health Association;
Guttmacher Institute; National Family Planning and Reproductive Health  Association; National Latina Institute for Reproductive Health;
National Womens Health Network; Reproductive Health Technologies  Project; R Alta Charo
Amici on Behalf of Appellees

Kimberlee W. Colby, Esq.
Christian Legal Society
Center for Law & Religious Freedom
8001 Braddock Road, Suite 302
Springfield, VA 22151

Counsel for Institutional Religious Freedom Alliance; C12 Group; Christian Legal Society; Ethics and Religious Liberty Commission of the Southern

Baptist Convention; Association of Christian Schools;
Association for Gospel Rescue Missions; National
Association of Evangelicals; Patrick Henry College;
Prison Fellowship Ministries
Amici on Behalf of Appellants

Sarah Somers, Esq.
National Health Law Program
101 East Weaver Street
Carrboro, NC 27510

Counsel for Asian Pacific American Legal Center;
Black Women's Health Imperative; Campaign to End
Aids; Forward Together; Housing Works; Mexican
American Legal Defense and Educational Fund;
National Health Program; National Hispanic Medical
Association; National Women and AIDS Collective;
Sexuality Information & Education Council of the
United States; IPAS; HIV Law Project
Amici on Behalf of Appellants

Brendan M. Walsh, Esq.
Pashman Stein
21 Main Street
Court Plaza South, Suite 100
Hackensack, NJ 07601

Counsel for Orrin G. Hatch; James M. Inhofe; Daniel
R. Coats; Mitch McConnell; Rob Portman; Pat Roberts
Amici on Behalf of Appellants

Deborah J. Dewart, Esq.
620 East Sabiston Drive
Swansboro, NC 28584

   Counsel for Liberty Life and Law Foundation
   Amicus on Behalf of Appellants

Jason P. Gosselin, Esq.
Richard M. Haggerty, Jr., Esq.
Drinker, Biddle & Reath
18th and Cherry Streets
One Logan Square, Suite 2000
Philadelphia, PA 19103

   Counsel for New Jersey Family Policy Council
   Amicus on Behalf of Appellants

Steven W. Fitschen, Esq.
The National Legal Foundation
2224 Virginia Beach Blvd., Suite 204
Virginia Beach, VA 23454

   Counsel for National Legal Foundation; Bradley P.
   Jacob; Texas Center for Defense of Life
   Amici on Behalf of Appellees

Charles E. Davidow, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison
2001 K Street, N.W., Suite 600
Washington, DC 20006

Counsel for National Organization for Women
Foundation; National Women's Law Center;
Population Connection; Service Employees
International Union; Ibis Reproductive Health;
MergerWatch; Naral Pro Choice America; Planned
Parenthood Association of the Mercer Area Inc.;
Planned Parenthood of Central Pennsylvania; Planned
Parenthood of Delaware Inc.; Planned Parenthood of
Northeast Middle Pennsylvania and Bucks County;
Planned Parenthood of Southeastern Pennsylvania;
Planned Parenthood of Western Pennsylvania; Raising
Women's Voices for the Health Care We Need;
Women's Law Project; American Association
University Women
Amici on Behalf of Appellees

Emily M. Bell, Esq.
Clymer, Musser, Brown & Conrad
408 West Chestnut Street
Lancaster, PA 17603

Counsel for Breast Cancer Prevention Institute
Coalition on Abortion Breast Cancer;
Polycarp Research Institute;
Amici on Behalf of Appellants

Daniel Mach, Esq.
American Civil Liberties Union
915 15th Street, N.W., 6th Floor
Washington, DC 20005

Counsel for American Civil Liberties Union;
American Civil Liberties Union of Pennsylvania;
Anti Defamation League; Catholics for a Free Choice;
Hadassah; Women's Zionist Organization of America
Inc. Interfaith Alliance Foundation; National Coalition
of American Nuns; National Council of Women Inc.
Religious Coalition for Reproductive Choice Religious
Institute; Unitarian Universalist Association;
Unitarian Universalist Women's Federation
Amici on Behalf of Appellees

Thomas W. Ude, Esq.
Lambda Legal Defense & Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005

Counsel for Lambda Legal Defense & Education Fund
Inc.
Amicus on Behalf of Appellees

_____

## OPINION
_____

COWEN, Circuit Judge.

Appellants Conestoga Wood Specialties Corporation ("Conestoga"), Norman Hahn, Elizabeth Hahn, Norman Lemar Hahn, Anthony Hahn, and Kevin Hahn (collectively, "the Hahns") appeal from an order of the District Court

denying their motion for a preliminary injunction. In their Complaint, Appellants allege that regulations promulgated by the Department of Health and Human Services ("HHS"), which require group health plans and health insurance issuers to provide coverage for contraceptives, violate the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb ("RFRA") and the Free Exercise Clause of the First Amendment of the United States Constitution.[1] The District Court denied a preliminary injunction, concluding that Appellants were unlikely to succeed on the merits of their claims. *See Conestoga Wood Specialties Corp. v. Sebelius*, No. 12-CV-6744, 2013 WL 140110 (E.D. Pa. Jan. 11, 2013). Appellants then filed an expedited motion for a stay pending appeal with this Court, which was denied. *See Conestoga Wood Specialties Corp. v. Sec'y of the United States Dep't of Health & Human Servs.*, No. 13-1144, 2013 WL 1277419 (3d Cir. Feb. 8, 2013). Now, we consider the fully briefed appeal from the District Court's denial of a preliminary injunction.

Before we can even reach the merits of the First Amendment and RFRA claims, we must consider a threshold issue: whether a for-profit, secular corporation is able to

---

[1] The Complaint also alleges that the regulations violate the Establishment Clause, the Free Speech Clause, the Due Process Clause, and the Administrative Procedure Act. While the District Court's opinion addressed some of these additional claims, Appellants have limited their appeal to whether the regulations violate the RFRA and the Free Exercise Clause.

engage in religious exercise under the Free Exercise Clause of the First Amendment and the RFRA. As we conclude that for-profit, secular corporations cannot engage in religious exercise, we will affirm the order of the District Court.

I.

In 2010, Congress passed the Patient Protection and Affordable Care Act, Pub. L. No. 111-148 (March 23, 2010) ("ACA"). The ACA requires employers with fifty or more employees to provide their employees with a minimum level of health insurance. The ACA requires non-exempt group plans to provide coverage without cost-sharing for preventative care and screening for women in accordance with guidelines created by the Health Resources and Services Administration ("HRSA"), a subagency of HHS. *See* 42 U.S.C. § 300gg-13(a)(4).

The HRSA delegated the creation of guidelines on this issue to the Institute of Medicine ("IOM"). The IOM recommended that the HRSA adopt guidelines that require non-exempt group plans to cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."[2] These recommended guidelines

---

[2] *See* Women's Preventive Services: Required Health Plan Coverage Guidelines, *available at* www.hrsa.gov/womensguidelines (last visited July 25, 2013).

were approved by the HRSA. On February 15, 2012, HHS, the Department of the Treasury, and the Department of Labor published final rules memorializing the guidelines. *See* 77 Fed. Reg. 8725 (Feb. 15, 2012).[3] Under the regulations, group health plans and health insurance issuers are required to provide coverage consistent with the HRSA guidelines in plan years beginning on or after August 1, 2012, unless the employer or the plan is exempt.[4] Appellants refer to this requirement as the "Mandate," and we use this term throughout this opinion. Employers who fail to comply with the Mandate face a penalty of $100 per day per offending employee. *See* 26 U.S.C. § 4980D. The Department of Labor and plan participants may also bring a suit against an employer that fails to comply with the Mandate. *See* 29 U.S.C. § 1132.

II.

---

[3] These regulations were updated on July 2, 2013. *See* 78 Fed. Reg. 39870 (July 2, 2013). The recent changes have no impact on this litigation.

[4] The exemptions encompass "grandfathered" plans, which are plans that were in existence on March 23, 2010, *see* 45 C.F.R. § 147.140 and "religious employers," *see* 45 C.F.R. § 147.130(a)(1)(iv)(B). Additionally, the ACA requirement to provide employer sponsored health insurance to employees is entirely inapplicable to employers that have fewer than 50 employees. *See* 26 U.S.C. § 4980H(a), (c)(2)(A).

The Hahns own 100 percent of the voting shares of Conestoga. Conestoga is a Pennsylvania for-profit corporation that manufactures wood cabinets and has 950 employees. The Hahns practice the Mennonite religion. According to their Amended Complaint, the Mennonite Church "teaches that taking of life which includes anything that terminates a fertilized embryo is intrinsic evil and a sin against God to which they are held accountable." (Am. Compl. ¶ 30.)[5] Specifically, the Hahns object to two drugs that must be provided by group health plans under the Mandate that "may cause the demise of an already conceived but not yet attached human embryo." (*Id.* at ¶ 45.) These are "emergency contraception" drugs such as Plan B (the "morning after pill") and *ella* (the "week after pill"). The Amended Complaint alleges that it is immoral and sinful for Appellants to intentionally participate in, pay for, facilitate, or otherwise support these drugs. (*Id.* at ¶ 32.) Conestoga has been subject to the Mandate as of January 1, 2013, when its group health plan came up for renewal. As a panel of this Court previously

---

[5] In addition, on October 31, 2012, Conestoga's Board of Directors adopted "The Hahn Family Statement on the Sanctity of Human Life," which provides, amongst other things, that "The Hahn Family believes that human life begins at conception (at the point where an egg and sperm unite) and that it is a sacred gift from God and only God has the right to terminate human life. Therefore, it is against our moral conviction to be involved in the termination of human life through abortion, suicide, euthanasia, murder, or any other acts that involve the taking of human life." (*Id.* at ¶ 92.)

13

denied an injunction pending appeal, Conestoga is currently subject to the Mandate, and in fact, Appellants' counsel represented during oral argument that Conestoga is currently complying with the Mandate.

## III.

We review a district court's denial of a preliminary injunction for abuse of discretion, but review the underlying factual findings for clear error and questions of law de novo. *Am. Express Travel Related Servs. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). The District Court had jurisdiction over this case under 28 U.S.C. § 1331. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

"A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). A plaintiff seeking an injunction must meet all four criteria, as "[a] plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999). This is the same standard applied in the District Court, and, on appeal, no party has questioned its

accuracy.[6]  We will first consider whether Appellants are likely to succeed on the merits of their claim, beginning with the claims asserted by Conestoga, a for-profit, secular corporation.

## IV.

## A.

First, we turn to Conestoga's claims under the First Amendment.  Under the First Amendment, "Congress shall make no law respecting the establishment of religion or prohibiting the free exercise thereof."  The threshold question for this Court is whether Conestoga, a for-profit, secular corporation, can exercise religion.  In essence, Appellants offer two theories under which we could conclude that Conestoga can exercise religion: (a) directly, under the Supreme Court's recent decision in *Citizens United*, and (b) indirectly, under the "passed through" method that has been articulated by the Court of Appeals for the Ninth Circuit.  We will discuss each theory in turn.

---

[6] The dissent has undertaken a scholarly survey of the proper standard for obtaining a preliminary injunction throughout the country.  However, Appellants never took an appeal of the preliminary injunction standard applied by the District Court.  (*See* Appellants' Br. at 4-6 (statement of issues presented for review).)  Moreover, the dissent acknowledges that it "may be true" that the plaintiff's failure to satisfy any element in its favor renders a preliminary injunction inappropriate. (Dissenting Op. at 9.)

15

In *Citizens United*, the Supreme Court held that "the Government may not suppress political speech on the basis of the speaker's corporate identity," and it accordingly struck down statutory restrictions on corporate independent expenditure. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365 (2010). *Citizens United* recognizes the application of the First Amendment to corporations generally without distinguishing between the Free Exercise Clause and the Free Speech Clause, both which are contained within the First Amendment. Accordingly, whether *Citizens United* is applicable to the Free Exercise Clause is a question of first impression. *See Hobby Lobby Stores, Inc. v. Sebelius*, 133 S. Ct. 641, 643 (2012) (Sotomayor, Circuit Justice) ("This court has not previously addressed similar RFRA or free exercise claims brought by closely held for-profit corporations and their controlling shareholders . . . .").

While "a corporation is 'an artificial being, invisible, intangible, and existing only in contemplation of law,' . . . a wide variety of constitutional rights may be asserted by corporations." *Consol. Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338, 347 (2d Cir. 2002) (quoting *Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 636 (1819) (Marshall, C.J.)) In analyzing whether constitutional guarantees apply to corporations, the Supreme Court has held that certain guarantees are held by corporations and that certain guarantees are "purely personal" because "the 'historic function' of the particular guarantee has been limited to the protection of individuals." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 778 n.14 (1978) (internal citation omitted). The *Bellotti*

16

Court observed:

> Corporate identity has been determinative in several decisions denying corporations certain constitutional rights, such as the privilege against compulsory self-incrimination, *Wilson v. United States,* 221 U.S. 361, 382–386, 31 S. Ct. 538, 545–546, 55 L. Ed. 771 (1911), or equality with individuals in the enjoyment of a right to privacy, *California Bankers Assn. v. Shultz,* 416 U.S. 21, 65–67, 94 S. Ct. 1494, 1519–1520, 39 L. Ed. 2d 812 (1974); *United States v. Morton Salt Co.,* 338 U.S. 632, 651–652, 70 S. Ct. 357, 368–369, 94 L. Ed. 401 (1950), but this is not because the States are free to define the rights of their creatures without constitutional limit. Otherwise, corporations could be denied the protection of all constitutional guarantees, including due process and the equal protection of the laws. Certain "purely personal" guarantees, such as the privilege against compulsory self-incrimination, are unavailable to corporations and other organizations because the "historic function" of the particular guarantee has been limited to the protection of individuals. *United States v. White,* 322 U.S. 694, 698–701, 64 S. Ct. 1248, 1251–1252, 88 L. Ed. 1542 (1944). Whether or not a particular guarantee is "purely personal" or is unavailable to corporations for some other reason depends on the nature, history, and

17

purpose of the particular constitutional provision.

*Id.* Thus, we must consider whether the Free Exercise Clause has historically protected corporations, or whether the "guarantee is 'purely personal' or is unavailable to corporations" based on the "nature, history, and purpose of [this] particular constitutional provision." *Id.*

In *Citizens United*, the Supreme Court pointed out that it has "recognized that First Amendment protection extends to corporations." *Citizens United*, 558 U.S. at 342. It then cited to more than twenty cases, from as early as the 1950's, including landmark cases such as *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), in which the Court recognized that First Amendment free speech rights apply to corporations. *See id.* The *Citizens United* Court particularly relied on *Bellotti*, which struck down a state-law prohibition on corporate independent expenditures related to referenda issues. *Bellotti* held:

> We thus find no support in the First or Fourteenth Amendment, or in the decisions of this Court, for the proposition that speech that otherwise would be within the protection of the First Amendment loses that protection simply because its source is a corporation that cannot prove, to the satisfaction of a court, a material effect on its business or property. [That proposition] amounts to an impermissible legislative prohibition of speech based on the

18

identity of the interests that spokesmen may represent in public debate over controversial issues and a requirement that the speaker have a sufficiently great interest in the subject to justify communication.

*Bellotti*, 435 U.S. at 784. Discussing *Bellotti's* rationale, *Citizens United* stated that the case "rested on the principle that the Government lacks the power to ban corporations from speaking." *Citizens United*, 558 U.S. at 347; *see also Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) ("The identity of the speaker is not decisive in determining whether speech is protected" as "[c]orporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster.") (quoting *Bellotti*, 435 U.S. at 795).

*Citizens United* is thus grounded in the notion that the Court has a long history of protecting corporations' rights to free speech. *Citizens United* overruled *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), a case in which the Court had "uph[eld] a direct restriction on the independent expenditure of funds for political speech for the first time in [this Court's] history." *Citizens United*, 558 U.S. at 347 (quoting *Austin*, 494 U.S. at 695 (Kennedy, J., dissenting)). The *Citizens United* Court found that it was "confronted with conflicting lines of precedent: a pre-*Austin* line that forbids restrictions on political speech based on the speaker's corporate identify and a post-*Austin* line that permits them." *Id.* at 348. Faced with this conflict, the Court decided that

19

*Austin* was wrongly decided, based on the otherwise consistent line of cases in which corporations were found to have free speech rights.

We must consider the history of the Free Exercise Clause and determine whether there is a similar history of courts providing free exercise protection to corporations. We conclude that there is not. In fact, we are not aware of any case preceding the commencement of litigation about the Mandate, in which a for-profit, secular corporation was itself found to have free exercise rights.[7] Such a total absence of caselaw takes on even greater significance when compared to the extensive list of Supreme Court cases addressing the free speech rights of corporations.

After all, as the Supreme Court observed in *Schempp*, the purpose of the Free Exercise Clause "is to secure religious liberty *in the individual* by prohibiting any invasions thereof by civil authority." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223 (1963) (emphasis added). And as the District Court aptly noted in its opinion, "[r]eligious belief takes shape within the minds and hearts of individuals, and its protection is one of the more uniquely 'human' rights provided

---

[7] We acknowledge that the Court of Appeals for the Tenth Circuit, in an eight judge en banc panel, in six separate opinions, recently held that for-profit, secular corporations can assert RFRA and free exercise claims in some circumstances. *See Hobby Lobby Stores, Inc. v. Sebelius*, No. 12-6294, 2013 WL 3216103 (10th Cir. June 27, 2013). We respectfully disagree with that Court's analysis.

20

by the Constitution." *Conestoga*, 2013 WL 140110, at \*7. We do not see how a for-profit "artificial being, invisible, intangible, and existing only in contemplation of law," *Consol. Edison Co.*, 292 F.3d at 346 (quoting *Dartmouth Coll.*, 17 U.S. at 636 (Marshall, C.J.)), that was created to make money could exercise such an inherently "human" right.

We are unable to determine that the "nature, history, and purpose" of the Free Exercise Clause supports the conclusion that for-profit, secular corporations are protected under this particular constitutional provision. *See Bellotti¸* 435 U.S. at 778 n.14. Even if we were to disregard the lack of historical recognition of the right, we simply cannot understand how a for-profit, secular corporation—apart from its owners—can exercise religion. As another court considering a challenge to the Mandate noted:

> General business corporations do not, separate and apart from the actions or belief systems of their individual owners or employees, exercise religion. They do not pray, worship, observe sacraments or take other religiously-motivated actions separate and apart from the intention and direction of their individual actors.

*Hobby Lobby Stores, Inc. v. Sebelius,* 870 F. Supp. 2d 1278, 1291 (W.D. Okla. 2012), *rev'd en banc*, No. 12-6294, 2013 WL 3216103 (10th Cir. June 27, 2013); *see also Hobby Lobby Stores, Inc.*, 2013 WL 3216103, at \*51 (Briscoe, C.J., concurring in part and dissenting in part) (questioning "whether a corporation can 'believe' at all, *see Citizens*

*United*, 130 S.Ct. at 972 ('It might also be added that corporations have no consciences, no beliefs, no feelings, no thoughts, no desires.') (Stevens, J., concurring in part and dissenting in part).").

In urging us to hold that for-profit, secular corporations can exercise religion, Appellants, as well as the dissent, cite to cases in which courts have ruled in favor of free exercise claims advanced by religious organizations. *See, e.g.*, *Gonzalez v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418 (2006); *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993). None of the cases relied on by the dissent involve secular, for-profit corporations. We will not draw the conclusion that, just because courts have recognized the free exercise rights of churches and other religious entities, it necessarily follows that for-profit, secular corporations can exercise religion. As the Supreme Court recently noted, "the text of the First Amendment . . . gives special solicitude to the rights of religious organizations." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 706 (2012). That churches—as means by which individuals practice religion—have long enjoyed the protections of the Free Exercise Clause is not determinative of the question of whether for-profit, secular corporations should be granted these same protections.

Appellants also argue that *Citizens United* is applicable to the Free Exercise Clause because "the authors of the First Amendment only separated the Free Exercise Clause and the Free Speech Clause by a semi-colon, thus showing the continuation of intent between the two." (Appellants' Br. at

22

34.) We are not persuaded that the use of a semi-colon means that each clause of the First Amendment must be interpreted jointly.

In fact, historically, each clause has been interpreted separately. Accordingly, the courts have developed different tests in an effort to apply these clauses. For example, while the various clauses of the First Amendment have been incorporated and made applicable to the states by the Due Process Clause of the Fourteenth Amendment, the Supreme Court did so at different times. Incorporation of the clauses of the First Amendment began with *Gitlow v. New York*, 268 U.S. 652, 666 (1925), where the Court noted that "we may and do assume that freedom of speech and of the press—which are protected by the First Amendment from abridgment by Congress—are among the fundamental rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States." More than ten years later, in *De Jonge v. Oregon*, 299 U.S. 353 (1937), the Court incorporated the right of peaceable assembly. In doing so, the Court cited to *Gitlow,* and noted that "[t]he right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." *Id.* at 364. The language is important—even though the Free Speech Clause and the Petition Clause appear next to one another in the First Amendment, the Court did not find that *Gitlow* had already decided that the Petition Clause was incorporated, but rather cited *Gitlow* as precedent to expand the incorporation doctrine to cover the Petition Clause.

Several years later, in *Cantwell v. Connecticut*, 310

23

U.S. 296 (1940), the Supreme Court incorporated the Free Exercise Clause. The *Cantwell* Court did not cite to *Gitlow* as authority for incorporating the Free Exercise Clause; in other words, it did not automatically follow that the Free Exercise Clause was incorporated just because the Free Speech Clause was incorporated. Seven years after *Cantwell*, in *Everson v. Board of Education*, 330 U.S. 1 (1947), the Court incorporated the Establishment Clause. In *Everson*, the Court cited to *Cantwell* and noted that the Court's interpretation of the Free Exercise Clause should be applied to the Establishment Clause. *Id.* at 15. But notably, it took seven years for the Court to hold this; and following the same pattern, *Cantwell* did not automatically incorporate the Establishment Clause. Thus, it does not automatically follow that all clauses of the First Amendment must be interpreted identically.

Second, Appellants argue that Conestoga can exercise religion under a "passed through" theory, which was first developed by the Court of Appeals for the Ninth Circuit in *EEOC v. Townley Engineering & Manufacturing Company*, 859 F.2d 610 (9th Cir. 1988), and affirmed in *Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009). In *Townley* and *Stormans*, the Ninth Circuit held that for-profit corporations can assert the free exercise claims of their owners.

In *Townley*, the plaintiff was a closely-held manufacturing company whose owners made a "covenant with God requir[ing] them to share the Gospel with all of their employees." *Townley,* 859 F.2d at 620. Townley, the plaintiff corporation, sought an exemption, on free exercise grounds, from a provision of Title VII of the Civil Rights Act

24

that required it to accommodate employees asserting religious objections to attending the company's mandatory devotional services. Although the plaintiff urged the "court to hold that it is entitled to invoke the Free Exercise Clause on its own behalf," the Ninth Circuit deemed it "unnecessary to address the abstract issue whether a for profit corporation has rights under the Free Exercise Clause independent of those of its shareholders and officers." *Id.* at 619-20. Rather, the court concluded that, "Townley is merely the instrument through and by which Mr. and Mrs. Townley express their religious beliefs." *Id.* at 619. As "Townley presents no rights of its own different from or greater than its owners' rights," the Ninth Circuit held that "the rights at issue are those of Jake and Helen Townley." *Id.* at 620. The court then examined the rights at issue as those of the corporation's owners, ultimately concluding that Title VII's requirement of religious accommodation did not violate the Townleys' free exercise rights. *Id.* at 621.

The Ninth Circuit subsequently applied *Townley*'s reasoning in *Stormans.* There, a pharmacy brought a Free Exercise Clause challenge to a state regulation requiring it to dispense Plan B, an emergency contraceptive drug. *Stormans,* 586 F.3d at 1117. In analyzing whether the pharmacy had standing to assert the free exercise rights of its owners, the court emphasized that the pharmacy was a "fourth-generation, family-owned business whose shareholders and directors are made up entirely of members of the Stormans family." *Id.* at 1120. As in *Townley*, it "decline[d] to decide whether a for-profit corporation can assert its own rights under the Free Exercise Clause and

25

instead examine[d] the rights at issue as those of the corporate owners." *Id.* at 1119. The court concluded that the pharmacy was "an extension of the beliefs of members of the Stormans family, and that the beliefs of the Stormans family are the beliefs of" the pharmacy. *Id.* at 1120. Because the pharmacy did "not present any free exercise rights of its own different from or greater than its owners' rights," the Ninth Circuit held, as it had in *Townley*, that the company had "standing to assert the free exercise rights of its owners." *Id.*

Appellants argue that Conestoga is permitted to assert the free exercise claims of the Hahns, its owners, under the *Townley/Stormans* "passed through" theory. After carefully considering the Ninth Circuit's reasoning, we are not persuaded. We decline to adopt the *Townley/Stormans* theory, as we believe that it rests on erroneous assumptions regarding the very nature of the corporate form. In fact, the Ninth Circuit did not mention certain basic legal principles governing the status of a corporation and its relationship with the individuals who create and own the entity. It is a fundamental principle that "incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created" the corporation. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001). The "passed through" doctrine fails to acknowledge that, by incorporating their business, the Hahns themselves created a distinct legal entity that has legally distinct rights and responsibilities from the Hahns, as the owners of the corporation. *See Barium Steel Corp. v. Wiley*, 108 A.2d 336, 341 (Pa. 1954) ("It is well established [under Pennsylvania

26

law] that a corporation is a distinct and separate entity, irrespective of the persons who own all its stock."). The corporate form offers several advantages "not the least of which was limitation of liability," but in return, the shareholder must give up some prerogatives, "including that of direct legal action to redress an injury to him as primary stockholder in the business." *Kush v. Am. States Ins. Co.*, 853 F.2d 1380, 1384 (7th Cir. 1988). Thus, under Pennsylvania law—where Conestoga is incorporated—"[e]ven when a corporation is owned by one person or family, the corporate form shields the individual members of the corporation from personal liability." *Kellytown Co. v. Williams*, 426 A.2d 663, 668 (Pa. Super. Ct. 1981).

Since Conestoga is distinct from the Hahns, the Mandate does not actually require *the Hahns* to do anything. All responsibility for complying with the Mandate falls on *Conestoga*. Conestoga "is a closely-held, family-owned firm, and [we] suspect there is a natural inclination for the owners of such companies to elide the distinction between themselves and the companies they own." *Grote v. Sebelius*, 708 F.3d 850, 857 (7th Cir. 2013) (Rovner, J., dissenting). But, it is Conestoga that must provide the funds to comply with the Mandate—not the Hahns. We recognize that, as the sole shareholders of Conestoga, ultimately the corporation's profits will flow to the Hahns. But, "[t]he owners of an LLC or corporation, even a closely-held one, have an obligation to respect the corporate form, on pain of losing the benefits of that form should they fail to do so." *Id.* at 858 (Rovner, J., dissenting). "The fact that one person owns all of the stock does not make him and the corporation one and the same

person, nor does he thereby become the owner of all the property of the corporation." *Wiley*, 108 A.2d at 341. The Hahn family chose to incorporate and conduct business through Conestoga, thereby obtaining both the advantages and disadvantages of the corporate form. We simply cannot ignore the distinction between Conestoga and the Hahns. We hold— contrary to *Townley* and *Stormans*—that the free exercise claims of a company's owners cannot "pass through" to the corporation.

## B.

Next, we consider Conestoga's RFRA claim. Under the RFRA, "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability [unless the burden] (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb-1(a)-(b). As with the inquiry under the Free Exercise Clause, our preliminary inquiry is whether a for-profit, secular corporation can assert a claim under the RFRA. Under the plain language of the statute, the RFRA only applies to a "person's exercise of religion." *Id.* at § 2000bb-1(a).

Our conclusion that a for-profit, secular corporation cannot assert a claim under the Free Exercise Clause necessitates the conclusion that a for-profit, secular corporation cannot engage in the exercise of religion. Since Conestoga cannot exercise religion, it cannot assert a RFRA claim. We thus need not decide whether such a corporation is

28

a "person" under the RFRA.

## V.

Finally, we consider whether the Hahns, as the owners of Conestoga, have viable Free Exercise Clause and RFRA claims on their own. For the same reasons that we concluded that the Hahns' claims cannot "pass through" Conestoga, we hold that the Hahns do not have viable claims. The Mandate does not impose any requirements on the Hahns. Rather, compliance is placed squarely on Conestoga. If Conestoga fails to comply with the Mandate, the penalties—including fines, *see* 26 U.S.C. § 4980D, and civil enforcement, *see* 29 U.S.C. § 1132—would be brought against Conestoga, not the Hahns. As the Hahns have decided to utilize the corporate form, they cannot "move freely between corporate and individual status to gain the advantages and avoid the disadvantages of the respective forms." *Potthoff v. Morin*, 245 F.3d 710, 717 (8th Cir. 2001) (quoting *Kush*, 853 F.2d at 1384). Thus, we conclude that the Hahns are not likely to succeed on their free exercise and RFRA claims.

## VI.

As Appellants have failed to show that they are likely to succeed on the merits of their Free Exercise Clause and RFRA claims, we need not decide whether Appellants have shown that they will suffer irreparable harm, that granting preliminary relief will not result in even greater harm to the Government, and that the public interest favors the relief of a preliminary injunction. *See NutraSweet Co.*, 176 F.3d at 153 ("A

29

plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate."). Therefore, we will affirm the District Court's order denying Appellants' motion for a preliminary injunction.

\* \* \*

We recognize the fundamental importance of the free exercise of religion. As Congress stated, in passing the RFRA and restoring the compelling interest test to laws that substantially burden religion, "the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution." 42 U.S.C. § 2000bb(a). Thus, our decision here is in no way intended to marginalize the Hahns' commitment to the Mennonite faith. We accept that the Hahns sincerely believe that the termination of a fertilized embryo constitutes an "intrinsic evil and a sin against God to which they are held accountable," (Compl. ¶ 30), and that it would be a sin to pay for or contribute to the use of contraceptives which may have such a result. We simply conclude that the law has long recognized the distinction between the owners of a corporation and the corporation itself. A holding to the contrary—that a for-profit corporation can engage in religious exercise—would eviscerate the fundamental principle that a corporation is a legally distinct entity from its owners.

*Conestoga Wood Specialties Corp., et al. v. U.S. Dep't of Health & Human Servs., et al.*, (No. 13-1144)

JORDAN, *Circuit Judge*, dissenting.

Having previously dissented from the denial of a stay pending appeal in this case, I now have a second opportunity to consider the government's violation of the religious freedoms of Conestoga Wood Specialties Corporation ("Conestoga") and its owners, the Hahns, a family of devout Mennonite Christians who believe in the sanctity of human life. The Hahns do not want to be forced to pay for other people to obtain contraceptives and sterilization services, particularly the drugs known as "Plan B" (or the "morning after pill") and "Ella" (or the "week after pill"), which they view as chemical killers of actual lives in being. Sadly, the outcome for the Hahns and their business is the same this time as it was the last time they were before us. My colleagues, at the government's urging, are willing to say that the Hahns' choice to operate their business as a corporation carries with it the consequence that their rights of conscience are forfeit.

That deeply disappointing ruling rests on a cramped and confused understanding of the religious rights preserved by Congressional action and the Constitution. The government takes us down a rabbit hole where religious rights are determined by the tax code, with non-profit corporations able to express religious sentiments while for-profit corporations and their owners are told that business is business and faith is irrelevant. Meanwhile, up on the surface, where people try to live lives of integrity and purpose, that kind of division sounds as hollow as it truly is. I

do not believe my colleagues or the District Court judge whose opinion we are reviewing are ill-motivated in the least, but the outcome of their shared reasoning is genuinely tragic, and one need not have looked past the first row of the gallery during the oral argument of this appeal, where the Hahns were seated and listening intently, to see the real human suffering occasioned by the government's determination to either make the Hahns bury their religious scruples or watch while their business gets buried. So, as I did the last time this case was before us, I respectfully dissent.

## I.    Background

Five members of the Hahn family – Norman, Elizabeth, Norman Lemar, Anthony, and Kevin – own 100 percent of Conestoga, which Norman founded nearly fifty years ago and which, as noted by the Majority, is a Pennsylvania corporation that manufactures wood cabinets. (Maj. Op. at 12.)   The Hahns are hands-on owners.  They manage their business and try to turn a profit, with the help of Conestoga's 950 full-time employees.  It is undisputed that the Hahns are entirely committed to their faith, which influences all aspects of their lives.  They feel bound, as the District Court observed, "to operate Conestoga in accordance with their religious beliefs and moral principles." *Conestoga Wood Specialties Corp. v. Sebelius*, No. 12-6744, 2013 WL 140110, at *3 (E.D. Pa. Jan. ll, 2013).   One manifestation of that commitment is the "Statement on the Sanctity of Human Life" adopted by Conestoga's Board of Directors on October 31, 2012, proclaiming that

> [t]he Hahn Family believes that human life begins at conception (at the point where an egg

2

and sperm unite) and that it is a sacred gift from God and only God has the right to terminate human life. Therefore it is against our moral conviction to be involved in the termination of human life through abortion, suicide, euthanasia, murder, or any other acts that involve the deliberate taking of human life.

*Id.* at \*18 n.5.

Accordingly, the Hahns believe that facilitating the use of contraceptives, especially ones that destroy a fertilized ovum,[1] is a violation of their core religious beliefs. (Am.

---

[1] Their concern seems aimed particularly at contraceptives that work after conception (*see* Am. Compl. at 9 (noting concern over mandated "drugs or devices that may cause the demise of an already conceived but not yet attached human embryo, such as 'emergency contraception' or 'Plan B' drugs (the so called 'morning after' pill)"), and the concern apparently increases the further along in the development of the fertilized egg that the contraceptive action of a drug or device takes place (*see id.* at 10 (discussing objections to "a drug called 'ella' (the so called 'week after' pill), which studies show can function to kill embryos even after they have attached to the uterus, by a mechanism similar to the abortion drug RU-486"). Being forced to assist in the acquisition and use of abortifacients is obviously of great concern to them. (*See* Appellants' Opening Br. at 10-11 ("[T]he Hahns believe that it would be sinful and immoral for them to intentionally participate in, pay for, facilitate, or otherwise support any contraception with an abortifacient effect through health insurance coverage they offer at

3

Conestoga.").)

 At oral argument, counsel for the government insisted that "abortifacient" is a "theological term," and that, "for federal law purposes, a device that prevents a fertilized egg from implanting in the uterus," like Plan B and Ella, "is not an abortifacient." (Oral Arg. at 37:13-37:45.) There was something telling in that lecture, and not what counsel intended. One might set aside the highly questionable assertion that "abortifacient" is a "theological" and not a scientific medical term, which must come as a surprise to the editors of dictionaries that include entries like the following: "abortifacient [MED] Any agent that induces abortion." McGraw-Hill Dictionary of Scientific and Technical Terms, 6th ed. (2003). And one could further ignore what appears to be an ongoing debate on whether drugs like Ella are technically abortifacients. (*See Amicus* Br. of Ass'n of Am. Physicians & Surgeons at 11 (arguing that "the low pregnancy rate for women who take *ella* four or five days after intercourse suggests that the drug *must* have an 'abortifacient' quality"); D.J. Harrison & J.G. Mitroka, *Defining Reality: The Potential Role of Pharmacists in Assessing the Impact of Progesterone Receptor Modulators and Misoprostol in Reproductive Health*, 45 Annals Pharmacotherapy 115, 116 (Jan. 2011) (cited in Ass'n of Am. Physicians & Surgeons et al. Amicus Br. at 10 n.15) (concluding that, based on data, "it can be reasonably expected that the [FDA-approved] dose of ulipristal [Ella] will have an abortive effect on early pregnancy in humans").) Though the Hahns' objections to contraception may be more intense as a zygote matures and implants, the point of this case, after all, is not who among contending doctors and scientists may be correct about the abortion-inducing qualities

4

Compl. ¶ 30, 32.) Conestoga, at the Hahns' direction, had previously provided health insurance that omitted coverage for contraception. (Am. Compl. ¶ 3.) Then came the Patient

---

of Ella or other drugs that the government wants to make the Hahns and their business buy for employees through forced insurance coverage. Whether a fertilized egg, being acted upon by a drug or device, is aborted after implantation or is never implanted at all is not pertinent to the Hahns' belief that a human life comes into being at conception and therefore the destruction of that entity is the taking of a human life. That belief is the point of this case, and the government is in no position to say anything meaningful about the Hahns' perspective on when life begins. But counsel's comment during argument does say something meaningful about the government's desire to avoid anything that might smack of religion in this case involving questions of religious freedom. The government evidently would like to drain the debate of language that might indicate the depth of feeling the Hahns have about what they are being coerced to do. "Keep the conversation as dry and colorless as possible," is the message. Don't let anything that sounds like "abortion" come up, lest the weight of that word disturb a happily bland consideration of corporate veils and insurance contracts. Like it or not, however, big issues – life and death, personal conscience, religious devotion, the role of government, and liberty – are in play here, and the government's effort to downplay the stakes is of no help. It does, however, highlight the continuing importance of the First Amendment, which "is an effort, not entirely forlorn, to interpose a bulwark between the prejudices of any official, legislator or judge and the stirrings of the spirit." *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 624 (9th Cir. 1988) (Noonan, J., dissenting).

5

Protection and Affordable Care Act (the "ACA") and related regulations, and the Hahns' previous decisions about employee benefits were no longer something the government would tolerate. Under rules effectively written by an entity called the "Institute of Medicine,"[2] corporations like Conestoga must purchase employee health insurance plans

---

[2] To attribute the rules to government personnel is unduly generous. As the Majority obliquely observes (*see* Maj. Op. at 11), the rules in question here are not the product of any legislative debate, with elected representatives considering the political sensitivities and constitutional ramifications of telling devout Mennonites to fund the destruction of what they believe to be human lives. They are not even the result of work within an administrative agency of the United States. They are instead the result of the ACA assigning regulatory authority to a subunit of the Department of Health and Human Services ("HHS") known as the Health Resources and Services Administration, 42 U.S.C. § 300gg-13(a)(4), which in turn turned the drafting over to the Institute of Medicine. (*See* Maj. Op. at 11.) What the Majority does not do is identify what the Institute of Medicine is. It is not an agency of the United States government, or of any other public entity. It is a private organization that, according to its website, "works outside of government to provide unbiased and authoritative advice to decision makers and the public." *See* About the IOM, http://www.iom.edu/About-IOM.aspx (last visited July 25, 2013). That self-serving declaration of its qualifications will not be of much comfort to those who wonder how a private organization, not answerable to the public, has ended up dictating regulations that the government insists overrides the Appellants' constitutional rights to religious liberty.

that include coverage for "[a]ll Food and Drug Administration [("FDA")] approved contraceptive methods, sterilization procedures, and patient education and counseling" – including so-called emergency contraceptives such as Plan B and Ella – "for all women with reproductive capacity, as prescribed by a provider." 77 Fed. Reg. 8725, 8725 (Feb. 15, 2012) (alterations in original) (internal quotation marks omitted). This is what has been dubbed the "contraception mandate" (the "Mandate"), and it brooks no exception for those, like the Appellants, who believe that supporting the use of certain contraceptives is morally reprehensible and contrary to God's word.[3] If the Hahns fail to have Conestoga submit to the offending regulations, the company will be subject to a "regulatory tax" – a penalty or fine – that will amount to about $95,000 per day and will rapidly destroy the business and the 950 jobs that go with it.[4]

---

[3] There are plenty of other exceptions, however, as I will discuss later. *See infra* Part III.A.2.b.i.

[4] According to 26 U.S.C. § 4980D(a), "[t]here is … a tax on any failure of a group health plan to meet the requirements of chapter 100 (relating to group health plan requirements)." The $95,000 estimate of the penalty takes account only of Conestoga's 950 employees. The actual penalty could amount to much more, given that the statute subjects noncompliant companies to a $100 per-day penalty for "any failure" to provide the mandated coverage "with respect to each individual to whom such failure relates." *Id.* § 4980D(b)(1). Presumably, "'individual' means each individual insured" by the company, *Hobby Lobby Stores, Inc. v. Sebelius*, __ F.3d __, 2013 WL 3216103, at *5 (10th Cir. 2013) (en banc), including employees' family members. Regardless, dead is dead, and Conestoga would as surely die

(*See* Maj. Op. at 13 (noting that "Conestoga is currently complying with the Mandate").)

Conestoga and the Hahns now argue that the Mandate is forcing them, day by day, to either disobey their religious convictions or to incur ruinous fines. That Hobson's choice, they say, violates both the First Amendment and the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb-1. I agree.

## II.     Standard of Review

To qualify for preliminary injunctive relief, a litigant must demonstrate "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). "We review the denial of a preliminary injunction for an abuse of discretion, an error of law, or a clear mistake in the consideration of proof," and "any determination that is a prerequisite to the issuance of an injunction is reviewed according to the

---

a rapid death under the weight of $95,000 per-day fines as it would under even higher fines.
      In the alternative, Conestoga presumably could drop employee health insurance altogether, and it would then face a reduced fine of $2,000 per full-time employee per year (totaling $1.9 million). *See* 26 U.S.C. § 4980H. Neither party has briefed that option, and it is unclear what additional consequences might follow from such action, including upward pressure on wages, etc.

8

standard applicable to that particular determination." *Id.* (alterations and internal quotation marks omitted). We therefore "exercise plenary review over the district court's conclusions of law and its application of law to the facts … ." *Id.* (internal quotation marks omitted). Highly relevant to this case, "a court of appeals must reverse if the district court has proceeded on the basis of an erroneous view of the applicable law." *Id.* (internal quotation marks omitted).

The Majority gives short shrift to the dispute over the standard of review that emerged during the earlier appeal in this case. My colleagues say simply that "[a] plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." (Maj. Op. at 14 (quoting *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)) (alteration in original) (internal quotation marks omitted)). That may be true, but it fails to address the problem that arose from the District Court's erroneous application of a more rigid standard than our case law requires. In explaining away the numerous decisions around the country that have decided that the government should be preliminarily enjoined from enforcing the Mandate, the Court claimed that those other decisions were the result of "a less rigorous standard" for the granting of preliminary injunctive relief than the standard in this Circuit. *Conestoga Wood Specialties Corp.*, 2013 WL 140110, at *4. More specifically, the Court said that those decisions "applied a 'sliding scale approach,' whereby an unusually strong showing of one factor lessens a plaintiff's burden in demonstrating a different factor."[5] *Id.* It then contrasted that

---

[5] *See Korte v. Sebelius*, No. 12-3841, 2012 WL 6757353, at *2 (7th Cir. Dec. 28, 2012) (noting that "[t]he

9

approach with what it characterized as this Court's approach, saying, "the Third Circuit … has no such 'sliding scale' standard, and Plaintiffs must show that all four factors favor preliminary relief." *Id.* The Majority hardly mentions the District Court's mistaken belief that our standard is more

more the balance of harms tips in favor of an injunction, the lighter the burden on the party seeking the injunction to demonstrate that it will ultimately prevail," and granting preliminary injunction pending appeal); *Grote v. Sebelius*, 708 F.3d 850, 853 n.2 (7th Cir. 2013) (adopting the reasoning of *Korte* and applying the same "sliding scale" standard); *Monaghan v. Sebelius*, __ F. Supp. 2d __, 2012 WL 6738476, at \*3 (E.D. Mich. Dec. 30, 2012) ("Courts ... may grant a preliminary injunction even where the plaintiff fails to show a strong or substantial probability of success on the merits, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued."); *Am. Pulverizer Co. v. U.S. Dep't of Health & Human Servs.*, No. 12-3459, 2012 WL 6951316, at \*5 (W.D. Mo. Dec. 20, 2012) (applying a sliding scale standard and concluding that "the balance of equities tip strongly in favor of injunctive relief in this case and that Plaintiffs have raised questions concerning their likelihood of success on the merits that are so serious and difficult as to call for more deliberate investigation"); *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 113 (D.D.C. 2012) (applying a sliding scale standard by which, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor" (alteration in original) (internal quotation marks omitted)).

daunting than the standard employed by other courts, nor that the District Court failed to apply binding precedent in which we have adopted the functional equivalent of a sliding scale standard.

It is true that we have not used the label "sliding scale" to describe our standard for preliminary injunctions, as numerous other circuit courts of appeals have.[6] But we have

---

[6] At least six circuits have explicitly adopted a "sliding scale" approach for evaluating a motion for a preliminary injunction. *See McCormack v. Hiedeman*, 694 F.3d 1004, 1016 n.7 (9th Cir. 2012) ("[T]he 'sliding scale' approach to preliminary injunctions remains valid: A preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." (alteration and internal quotation marks omitted)); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) ("The four factors have typically been evaluated on a 'sliding scale.' If the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."); *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 547 (7th Cir. 2007) (endorsing a "'sliding scale' approach" pursuant to which "if the appeal has some though not necessarily great merit, then the showing of harm of … [great] magnitude … would justify the granting of an injunction pending appeal provided … that the defendant would not suffer substantial harm from the granting of the injunction"); *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003) ("In applying th[e] four-factor test, the irreparable harm to the plaintiff and the harm to the defendant are the two most important factors.

said that, "in a situation where factors of irreparable harm, interests of third parties and public considerations strongly favor the moving party, an injunction might be appropriate even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required." *Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978). On another occasion, we observed that "[a]ll of [the four preliminary injunction] factors often are weighed together in the final decision and the strength of the plaintiff's showing with respect to one may affect what will suffice with respect to another." *Marxe v. Jackson*, 833 F.2d 1121, 1128 (3d Cir. 1987). And again, we have said, "proper judgment entails a 'delicate balancing' of all elements." *Eli Lilly & Co. v. Premo Pharm. Labs., Inc.*, 630 F.2d 120, 136 (3d Cir. 1980) (quoting *Kreps*, 573 F.2d at 815)

---

Emphasis on the balance of these first two factors results in a sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa." (alteration and internal quotation marks omitted)); *Gately v. Commonwealth of Massachusetts*, 2 F.3d 1221, 1232 (1st Cir. 1993) (noting "the general principle that irreparable harm is subject to a sliding scale analysis, such that the showing of irreparable harm required of a plaintiff increases in the presence of factors … which cut against a court's traditional authority to issue equitable relief"); *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979) (when evaluating a motion for a preliminary injunction, "a sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits").

(internal quotation marks omitted).[7]  If those precedents are not the expression and application of a sliding scale, allowing

---

[7] As noted, *see supra* note 6, six circuits have used the label "sliding scale" to describe their approach to reviewing requests for preliminary injunctions.  Almost all of the remaining circuits have, like us, adopted an approach that, if not in name, mirrors the so-called sliding scale approach. *See Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006) ("No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue."); *Doe v. Sundquist*, 106 F.3d 702, 707 (6th Cir. 1997) ("We are mindful that even when a plaintiff's probability of success on the merits of a claim is not very high, a preliminary injunction may be appropriate if the plaintiff is in serious danger of irreparable harm absent an injunction.  Thus we have observed that the degree of likelihood of success that need be shown to support a preliminary injunction varies inversely with the degree of injury the plaintiff might suffer."); *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y., Inc.*, 749 F.2d 124, 125 (2d Cir. 1984) (per curiam) ("In our circuit a preliminary injunction will be issued when there is a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." (internal quotation marks omitted)); *Otero Sav. & Loan Ass'n v. Fed. Reserve Bank of Kansas City, Mo.*, 665 F.2d 275, 278 (10th Cir. 1981) ("The Tenth Circuit has adopted the Second Circuit's liberal definition of the 'probability of success' requirement.  When the other three requirements for a preliminary injunction are satisfied, it will

the strength of a showing on one factor to compensate for a weaker but still positive showing on another, I confess I do not know what to make of them. The District Court ignored the import of *Kreps*, *Marxe*, and *Eli Lilly*, despite our saying that a party can succeed in gaining injunctive relief if the threatened harm is particularly great and offsets a showing on "likelihood of success" that is less than might ordinarily be required. The Court thus erred, and we should say so.

Unlike the Majority, which tacitly endorses the District Court's application of an incorrect and unduly restrictive standard of review, I would apply the standard mandated by our own case law and used in the vast majority of our sister circuits.[8]

---

ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." (internal quotation marks omitted)).

Only one circuit appears to have rejected a balancing approach outright. The Eleventh Circuit "has not recognized" a sliding scale approach where there are "sufficiently serious questions going to the merits [that] make them a fair ground for litigation *and* [where there is] a balance of hardships tipping decidedly toward the party requesting preliminary relief." *Snook v. Trust Co. of Ga. Bank of Savannah, N.A.*, 909 F.2d 480, 483 n.3 (11th Cir. 1990) (internal quotation marks omitted).

[8] I have discussed the correct standard of review at length only to emphasize that, in view of the particularly heavy and irreparable harm that the Hahns and Conestoga are now suffering and will continue to suffer as a result of the

## III.   Discussion

The Majority, like the District Court, evaluates only one of the four preliminary injunction factors: the likelihood of the Hahns' and Conestoga's success on the merits.[9] Holding that the "Appellants have failed to show that they are

---

Majority's holding, *see infra* Part III.B, this case clearly meets the requirements for a preliminary injunction.   But even under the stricter standard applied by the District Court, I would still hold, for the reasons I provide in the remainder of this dissent, that the Hahns and Conestoga have made the necessary showing.   *See Hobby Lobby*, 2013 WL 3216103, at *8 ("[W]e need not resolve whether this relaxed standard would apply here, given that a majority of the court holds that Hobby Lobby and Mardel have satisfied the likelihood-of-success prong under the traditional standard.").

[9] The government has not asserted that the Anti-Injunction Act, which precludes judicial consideration of suits seeking to "restrain[] the assessment or collection of any [federal] tax," 26 U.S.C. § 7421(a), applies to this case.   As a result, that line of argument is waived.   *See Hobby Lobby*, 2013 WL 3216103, at *35 (Gorsuch, J., concurring) ("[A] waivable defense … is all the [Anti-Injunction Act] provides.").   At any rate, I would hold with the en banc ruling of the United States Court of Appeals for the Tenth Circuit that the Anti-Injunction Act does not apply in a case like this.   *See id.* at *7 ("[The for-profit corporate appellants] are not seeking to enjoin the collection of taxes or the execution of any IRS regulation; they are seeking to enjoin the enforcement, by whatever method, of one HHS regulation that they claim violates their RFRA rights.").

likely to succeed on the merits of their Free Exercise Clause and RFRA claims," the Majority "[does] not decide whether Appellants have shown that they will suffer irreparable harm, that granting preliminary relief will not result in even greater harm to the Government, [or] that the public interest favors the relief of a preliminary injunction." (Maj. Op. at 29.) My colleagues thereby avoid addressing, let alone weighing, the additional factors. I believe that they are wrong about the likelihood of success that both the Hahns and Conestoga should be credited with, and I am further persuaded that the remaining three factors, particularly the showing of irreparable harm, weigh overwhelmingly in favor of relief, as I will endeavor to explain.

### A. *Likelihood of Success on the Merits*

This case is one of many filed against the government in recent months by for-profit corporations and their owners seeking protection from the Mandate. *Conestoga Wood Specialties Corp.*, 2013 WL 140110, at *5. So far, most of those cases have reached the preliminary injunction stage only, and a clear majority of courts has determined that temporary injunctive relief is in order.[10] I join that consensus,

---

[10] *See Gilardi v. U.S. Dep't of Health & Human Servs.*, No. 1:13-cv-00104-EGS, slip op. at 1 (D.C. Cir. Mar. 29, 2013) (granting on court's own motion injunction pending appeal after first denying plaintiffs' motion on March 21, 2013); *Annex Med., Inc. v. Sebelius*, No. 13-1118, slip op. at 6 (8th Cir. Feb. 1, 2013) (granting injunction pending appeal); *Grote v. Sebelius*, 708 F.3d 850, 855 (7th Cir. 2013) (same); *Korte*, 2012 WL 6757353, at *2 (granting motion for injunction pending appeal because appellants "have

16

established both a reasonable likelihood of success on the merits and irreparable harm, and [because] the balance of harms tips in their favor"); *O'Brien v. U.S. Dep't of Health & Human Servs.*, No. 12-3357, slip op. at 1 (8th Cir. Nov. 28, 2012) (granting "[a]ppellants' motion for stay pending appeal," without further comment); *Hobby Lobby Stores, Inc. v. Sebelius*, No. 5:12-cv-01000-HE, slip op. at 3 (W.D. Okla. July 19, 2013) (enjoining government "from any effort to apply or enforce, as to plaintiffs, the substantive requirements imposed in 42 U.S.C. § 300gg-13(a)(4) and at issue in this case, or the penalties related thereto"); *Beckwith Elec. Co. v. Sebelius*, No. 8:13-cv-0648, 2013 WL 3297498, at *19 (M.D. Fla. June 25, 2013) (holding that religious rights are "not relinquished by efforts to engage in free enterprise under the corporate form," and granting motion for preliminary injunction); *Geneva Coll. v. Sebelius*, No. 2:12-cv-00207, 2013 WL 3071481, at *12 (W.D. Pa. June 18, 2013) (granting motion for preliminary injunction); *Hartenbower v. U.S. Dep't of Health & Human Servs.*, No. 1:13-CV-02253 (N.D. Ill. Apr. 18, 2013) (granting unopposed motion for preliminary injunction); *Hall v. Sebelius*, No. 13-0295 (D. Minn. Apr. 2, 2013) (granting unopposed motion for preliminary injunction); *Tonn & Blank Constr., LLC v. Sebelius*, No. 1:12-CV-325 (N.D. Ind. Apr. 1, 2013) (granting unopposed motion for preliminary injunction); *Bick Holding, Inc. v. Sebelius*, No. 4:13-cv-00462-AGF (E.D. Mo. Apr. 1, 2013) (granting unopposed motion for preliminary injunction); *Lindsay v. U.S. Dep't of Health & Human Servs.*, No. 13-c-1210, slip op. at 1 (N.D. Ill. Mar. 20, 2013) (preliminary injunction granted with "agreement of the parties"); *Monaghan v. Sebelius*, __ F. Supp. 2d __, 2013 WL 1014026, at *11 (granting preliminary injunction because

17

"[t]he Government has failed to satisfy its burden of showing that its actions were narrowly tailored to serve a compelling interest," and plaintiffs therefore "established at least some likelihood of succeeding on the merits of their RFRA claim"); *Sioux Chief Mfg. Co. v. Sebelius*, No. 13-0036, slip op. (W.D. Mo. Feb. 28, 2013) (granting unopposed motion for preliminary injunction); *Triune Health Grp., Inc. v. U.S. Dep't of Health & Human Servs.*, No. 12-06756, slip op. at 1 (N.D. Ill. Jan. 3, 2013) (granting motion for preliminary injunction); *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 2:12-CV-92-DDN, 2012 WL 6738489, at *7 (E.D. Mo. Dec. 31, 2012) (holding that "plaintiffs are entitled to injunctive relief that maintains the status quo until the important relevant issues have been more fully heard"); *Am. Pulverizer*, 2012 WL 6951316, at *5 (granting preliminary injunction because "the balance of equities tip strongly in favor of injunctive relief in this case and [because] Plaintiffs have raised questions concerning their likelihood of success on the merits that are so serious and difficult as to call for more deliberate investigation"); *Tyndale*, 904 F. Supp. 2d at 129 (granting preliminary injunction to publishing corporation and its president because they had "shown a strong likelihood of success on the merits of their RFRA claim," and because the other preliminary injunction factors favored granting the motion); *Legatus v. Sebelius*, 901 F. Supp. 2d 980, 999 (E.D. Mich. 2012) (granting preliminary injunction to for-profit, family-owned and operated corporation and holding that "[t]he harm in delaying the implementation of a statute that may later be deemed constitutional must yield to the risk presented here of substantially infringing the sincere exercise of religious beliefs"); *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1299

(D. Colo. 2012) (granting preliminary injunction, holding that "[t]he balance of the equities tip strongly in favor of injunctive relief in this case"). *But see Eden Foods, Inc. v. Sebelius*, No. 13-1677, slip op. at 2 (6th Cir. June 28, 2013) (denying injunction pending appeal and stating that it is "not persuaded, at this stage of the proceedings, that a for-profit corporation has rights under the RFRA" and that burden to company's owner "is too attenuated"); *Autocam Corp. v. Sebelius*, No. 12-2673, slip op. at 3 (6th Cir. Dec. 28, 2012) (denying motion for injunction pending appeal); *Mersino Mgmt. Co. v. Sebelius*, No. 13-cv-11296, slip op. at 2 (E.D. Mich. July 11, 2013) (denying motion for preliminary injunction); *Armstrong v. Sebelius*, No. 13-cv-00563 (D. Colo. May 10, 2013) (denying motion for preliminary injunction); *MK Chambers Co. v. U.S. Dep't of Health & Human Servs.*, No. 13-11379, 2013 WL 1340719, at *7 (E.D. Mich. Apr. 3, 2013) (denying request for a temporary restraining order); *Briscoe v. Sebelius*, No. 13-00285, 2013 WL 755413, at *5 (D. Colo. Feb. 27, 2013) (relying on recently overturned *Hobby Lobby* decisions to deny temporary restraining order).

In addition to those cases, the Fourth Circuit recently declined to rule on a challenge to the contraception Mandate in a case remanded to it by the Supreme Court, because the plaintiffs "did not challenge these regulations, or make any argument related to contraception or abortifacients, in the district court, in their first appeal … , or in their Supreme Court briefs." *Liberty Univ., Inc. v. Lew*, No. 10-2347, slip op. at 58, __ F.3d __ (4th Cir. July 11, 2013).

The Sixth Circuit's order denying preliminary injunctive relief in *Autocam* is of little persuasive value. In its order, the court acknowledged "conflicting decisions," but

and note also the recent en banc decision of the United States Court of Appeals for the Tenth Circuit holding that two for-profit companies had "established [that] they are likely to succeed on their RFRA claim" and that the Mandate threatened them with irreparable harm.[11] *Hobby Lobby Stores, Inc. v. Sebelius*, __ F.3d __, 2013 WL 3216103, at *24 (10th Cir. June 27, 2013) (en banc).

---

it denied injunctive relief because the district court in that case issued a "reasoned opinion" and because "the Supreme Court[] [had] recent[ly] deni[ed] … an injunction pending appeal in *Hobby Lobby*." *Autocam*, No. 12-2673, slip op. at 2 (citing *Hobby Lobby Stores, Inc. v. Sebelius*, 133 S. Ct. 641 (Dec. 26, 2012) (Sotomayor, J., as Circuit Justice). The Supreme Court opinion the *Autocam* court referred to was an in-chambers decision by Justice Sotomayor, acting alone, denying the plaintiffs' motion for an injunction pending appellate review. *Hobby Lobby Stores*, 133 S. Ct. 641. She denied the motion under the particular standard for issuance of an extraordinary writ by the Supreme Court, *id.* at 643, which differs significantly from our standard for evaluating a motion for a preliminary injunction. Under that more demanding standard, the entitlement to relief must be "'indisputably clear.'" *Id.* (quoting *Lux v. Rodrigues*, 131 S. Ct. 5, 6 (Sept. 30, 2010) (Roberts, C.J., as Circuit Justice)). The *Autocam* court's reliance on her opinion is therefore misplaced, and its decision is otherwise devoid of explanation.

[11] The *Hobby Lobby* court remanded the case for a determination regarding the remaining two preliminary injunction factors. *Id.* at *26.

20

To demonstrate a likelihood of success on the merits, a "plaintiff need only prove a prima facie case, not a certainty that he or she will win." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001). "[L]ikelihood of success" means that a plaintiff has "a reasonable chance, or probability, of winning." *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc). It "does not mean more likely than not."[12] *Id.* In the sense pertinent here, the term "likelihood" embodies "[t]he quality of offering a *prospect* of success," or showing some promise. Oxford English Dictionary, Vol. I, at 1625 (compact ed., 1986) (emphasis added). The Appellants have shown the requisite prospect of success.

### 1. *Conestoga's Right to Assert RFRA and First Amendment Claims*

I begin where the Majority begins and ends, with the issue of Conestoga's claim to religious liberty.[13] This may be thought of as a question of standing, and, though it was not couched that way in the briefing or argument before us, it has been addressed as such by other courts. *E.g.*, *Hobby Lobby*,

---

[12] Indeed, because the showing necessary for an injunction falls well below certainty, we have held that "this 'probability' ruling" is insufficient to establish that a party has "prevail[ed]" based solely on its being awarded a preliminary injunction. *Milgram*, 650 F.3d at 229.

[13] As I am addressing the Majority's reasoning, I begin with this point rather than the statutory question of whether Conestoga is a "person" under RFRA. As I explain below, *see infra* note 23, I believe that it is.

21

2013 WL 3216103, at *6; *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 114-19 (D.D.C. 2012); *Legatus v. Sebelius*, 901 F. Supp. 2d 980, 987-90 (E.D. Mich. 2012). However it may be framed, the government's assertion and the Majority's conclusion that Conestoga lacks any right to the free exercise of religion is flawed because the Constitution nowhere makes the "for-profit versus non-profit" distinction invented by the government, and the language and logic of Supreme Court jurisprudence justify recognizing that for-profit corporations like Conestoga are entitled to religious liberty.

The Majority declares that there is no "history of courts providing free exercise protection to corporations." (Maj. Op. at 20.) As my colleagues see it, "'[r]eligious belief takes shape within the minds and hearts of individuals, and its protection is one of the more uniquely human rights provided by the Constitution'" (*id.* at 20-21 (quoting *Conestoga Wood Specialties Corp.*, 2013 WL 140110, at *7)), so religion must be "an inherently 'human' right" that cannot be exercised by a corporation like Conestoga (*id.* at 21). That reasoning fails for several reasons. First, to the extent it depends on the assertion that collective entities, including corporations, have no religious rights, it is plainly wrong, as numerous Supreme Court decisions have recognized the right of corporations to enjoy the free exercise of religion. [14] *See*, *e.g.*, *Church of the*

---

[14] The Majority thinks it important that corporations lack the anthropomorphic qualities of individual religious devotion – "'[t]hey do not pray, worship, observe sacraments or take other religiously-motivated actions separate and apart from the intention and direction of their individual actors.'" (Maj. Op. at 21 (quoting *Hobby Lobby Stores, Inc. v.*

22

*Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 525-26 (1993) (recognizing the petitioner as a corporation whose congregants practiced the Santeria religion, and concluding that city ordinances violated the corporation's and its members' free exercise rights); *Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*,

---

*Sebelius*, 870 F. Supp. 2d 1278, 1291 (W.D. Okla. 2012), *rev'd en banc*, No. 12-6294, 2013 WL 3216103 (10th Cir. June 27, 2013)); *see also id.* (citing *Hobby Lobby*, 2013 WL 3216103, at *51 (Briscoe, C.J., concurring in part and dissenting in part) (questioning "whether a corporation can 'believe' at all")); *id.* at 21-22 (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 466 (2010) (Stevens, J., concurring in part and dissenting in part) ("It might also be added that corporations have no consciences, no beliefs, no feelings, no thoughts, no desires.")).) Of course, corporations do not picket, or march on Capitol Hill, or canvas door-to-door for moral causes either, but the Majority would not claim that corporations do not have First Amendment rights to free speech or to petition the government. Corporations have those rights not because they have arms and legs but because the people who form and operate them do, and we are concerned in this case with people, even when they operate through the particular form of association called a corporation. *See infra* note 17. It is perhaps no accident that the only support my colleagues put forward to show that a corporation's lack of body parts deprives it of religious liberty is a district court case that has been reversed, a dissent in a court of appeals case, and a dissent in a Supreme Court case. An argument that has lost three times is not necessarily wrong for that record, but maybe the record says something about the argument.

483 U.S. 327, 330 (1987) (recognizing the petitioner as a corporation in a case concerning free exercise rights); *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 n.29 (1983) (allowing two corporations that operated schools but could not be characterized as "churches or other purely religious institutions" to assert free exercise rights).

Taking the argument to be somewhat narrower, though – that it is only for-profit corporations that are sealed off from First Amendment religious liberty – it still fails. There is no reason to suppose that a profit motive places a corporation further away from what is "inherently human" than other sorts of motives, so the distinction the Majority draws has no intrinsic logic to recommend it. It also places far too much weight on a supposed lack of precedent. While authority is admittedly scanty, that is in all probability because there has never before been a government policy that could be perceived as intruding on religious liberty as aggressively as the Mandate, so there has been little reason to address the issue.[15] And, in any event, there is an obvious counterpoint to the Majority's observation: there may not be directly supporting case law, but the "conclusory assertion that a corporation has no constitutional right to free exercise of religion is [also] unsupported by any cited authority." *McClure v. Sports & Health Club*, 370 N.W.2d 844, 850

---

[15] The press reports are not in the record, but one would have to have been cut off from all media to miss the uproar created by the Mandate. *See, e.g.*, Ethan Bronner, *A Flood of Suits Fights Coverage of Birth Control*, New York Times, Jan. 26, 2013, at A1 (describing "a high-stakes clash between religious freedom and health care access that appears headed to the Supreme Court").

(Minn. 1985). In fact, it appears that, far from rejecting the proposition that for-profit corporations may have religious liberty interests, the Supreme Court has reserved the issue for a later time. *Cf. First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777 (1978) (declining to "address the abstract question whether corporations have the full measure of rights that individuals enjoy under the First Amendment"); *Amos*, 483 U.S. at 345 n.6 (Brennan, J., concurring in the judgment) (noting that "[i]t is also conceivable that some for-profit activities could have a religious character," and leaving open the issue of whether for-profit enterprises could have a religious exemption from Title VII of the Civil Rights Act of 1964); *id.* at 349 (O'Connor, J., concurring in the judgment) (expressly leaving open the same question).

The Majority slips away from its own distinction between for-profit and non-profit entities when it tries to support its holding with a citation to the Supreme Court's observation that the Free Exercise Clause "'secure[s] religious liberty in the individual by prohibiting any invasions thereof by civil authority.'" (Maj. Op. at 20 (quoting *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223 (1963)) (emphasis omitted).) If that out-of-context clause really meant, as the Majority argues, that the right was limited to individuals, then all groups would be left in the cold, not just for-profit corporations. But that is manifestly not what the quoted language means. Not only does the Majority's interpretation fly in the face of the already cited authority establishing that groups of people have free exercise rights as surely as each individual does, it falters simply as a matter of reason. To recognize that religious convictions are a matter of individual experience cannot and does not refute the collective character of much religious belief and observance.

Religious opinions and faith are in this respect akin to political opinions and passions, which are held and exercised both individually and collectively. "An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). And just as the Supreme Court has described the free exercise of religion as an "individual" right, *see Schempp*, 374 U.S. at 223, it has previously said the same thing of the freedom of speech, *see Gitlow v. New York*, 268 U.S. 652, 666 (1925) (calling freedom of speech a "fundamental personal right[]"), and still, notwithstanding that occasional characterization, there are a multitude of cases upholding the free speech rights of corporations. *E.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010) (recognizing that "First Amendment protection extends to corporations" and listing cases to that effect). Indeed, the Supreme Court has specifically "rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'" *Id.* at 343 (quoting *Bellotti*, 435 U.S. at 776). It thus does nothing to advance the discussion to say that the Free Exercise Clause secures religious liberty to individuals. Of course it does. That does not mean that associations of individuals, including corporations, lack free exercise rights.

I am not suggesting that corporations enjoy all of the same constitutionally grounded rights as individuals do. They do not, as the Supreme Court noted in *First National Bank of Boston v. Bellotti*, saying, "[c]ertain purely personal

26

guarantees … are unavailable to corporations and other organizations because the historic function of the particular guarantee has been limited to the protection of individuals." 435 U.S. at 778 n.14 (internal quotation marks omitted); *see Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 65-67 (1974) (declining to extend to a corporation the right to privacy to the same extent as individuals); *Wilson v. United States*, 221 U.S. 361, 382-86 (1911) (finding that the privilege against self-incrimination does not apply to corporations). The question in a case like this thus becomes "[w]hether or not a particular guarantee is 'purely personal.'" *Bellotti*, 435 U.S. at 778 n.14. And that, in turn, "depends on the nature, history, and purpose of the particular constitutional provision." *Id.*

Contrary to the Majority's conclusion, there is nothing about the "nature, history, and purpose" of religious exercise that limits it to individuals. Quite the opposite; believers have from time immemorial sought strength in numbers. They lift one another's faith and, through their combined efforts, increase their capacity to meet the demands of their doctrine. The use of the word "congregation" for religious groups developed for a reason. Christians, for example, may rightly understand the Lord's statement that, "where two or three are gathered together in my name, there am I in the midst of them," Matt. 18:20, to be not only a promise of spiritual outpouring but also an organizational directive. It thus cannot be said that religious exercise is a purely personal right, one that "cannot be utilized by or on behalf of any organization, such as a corporation." *United States v. White*, 322 U.S. 694, 699 (1944). It is exercised by organizations all the time.

27

Wait, says the government in response to such reasoning; don't get carried away by facts; any collective right to religious exercise must be limited to organizations that are specifically and exclusively dedicated to religious ends. As the government and the Majority see it, religious rights are more limited than other kinds of First Amendment rights. All groups can enjoy secular free expression and rights to assembly, but only "religious organizations" have a right to religious liberty. (*See* Appellee's Br. at 17 ("[W]hereas the First Amendment freedoms of speech and association are 'right[s] enjoyed by religious and secular groups alike,' the First Amendment's Free Exercise Clause 'gives special solicitude to the rights of religious organizations.'" (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 706, 713 (2012))); Maj. Op. at 18, 22 (acknowledging that "First Amendment free speech rights apply to corporations," but declining to "draw the conclusion that, just because courts have recognized the free exercise rights of churches and other religious entities, it necessarily follows that for-profit, secular corporations can exercise religion").) Of course, that view leaves it to the government to decide what qualifies as a "religious organization," which ought to give people serious pause since one of the central purposes of the First Amendment is to keep the government out of the sphere of religion entirely. *Cf. Illinois ex rel. McCollum v. Bd. of Educ. of Sch. Dist. No. 71*, 333 U.S. 203, 212 (1948) ("[T]he First Amendment rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere.").

Assuming, however, that the government had the competence to decide who is religious enough to qualify as a

28

"religious organization,"[16] there is no reason to suppose that the Free Exercise guarantee is as limited as the government

[16] Some wading into those waters has become inevitable. A handful of federal statutes create exemptions for "a religious corporation, association, educational institution, or society." 42 U.S.C. § 2000e-1(a) (Title VII); *see also id.* § 12113(d)(1), (2) (similar language in the Americans with Disabilities Act). In *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217 (3d Cir. 2007), we examined whether a Jewish community center qualified as a "religious organization" for purposes of Title VII to determine whether it was exempt from compliance with the religious discrimination provisions of Title VII's Section 702. Under a multi-factor test, we determined that the community center qualified as a "religious corporation, organization, or institution," because (1) "religious organizations may engage in secular activities without forfeiting protection under Section 702"; (2) "religious organizations need not adhere absolutely to the strictest tenets of their faiths to qualify for Section 702 protection"; (3) "religious organizations may declare their intention not to discriminate … without losing the protection of Section 702"; and (4) "the organization need not enforce an across-the-board policy of hiring only coreligionists." *Id.* at 229-30.

In contrast to that rather broad view of whether an organization qualifies for a religious exemption under Title VII, the definition of the term "religious employer" in the Mandate was notably cramped. *See* 45 C.F.R. § 147.130(a)(1)(iv)(B) (defining "religious employers" as "organization[s] that meet[] all of the following criteria: (1) The inculcation of religious values is the purpose of the organization. (2) The organization primarily employs persons

claims or the Majority accepts. Our Constitution recognizes the free exercise of religion as something in addition to other kinds of expression, not because it requires less deference, but arguably because it requires more. At the very least, it stands on an equal footing with the other protections of the First Amendment. *See Prince v. Massachusetts*, 321 U.S. 158, 164 (1944) ("[I]t may be doubted that any of the great liberties insured by the First Article can be given higher place than the others. All have preferred position in our basic scheme. All are interwoven there together."); *Cantwell v. Connecticut*, 310 U.S. 296, 310 (1940) ("[T]he people of this nation have ordained in the light of history, that … these liberties [religious faith and political belief] are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy. The essential characteristic of these liberties is, that under their shield many types of life, character, opinion and belief can develop unmolested and unobstructed."). The values protected by the religious freedom clauses of the First Amendment "have been zealously protected, sometimes even at the expense of other interests of admittedly high social importance." *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972).

---

who share the religious tenets of the organization. (3) The organization serves primarily persons who share the religious tenets of the organization. (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended."). HHS recently promulgated a new rule which purports to broaden the definition of "religious employer" to some extent. *See* 78 F.R. 39870-01.

30

In spite of that history of zealous protection, the Majority relegates religious liberty to second-class status, saying that, because Supreme Court case law incorporated the Free Exercise and Free Speech Clauses into the Fourteenth Amendment's Due Process clause at different times, "it does not automatically follow that all clauses of the First Amendment must be interpreted identically." (Maj. Op. at 24.) Implicit in the Majority's position is that the Free Exercise Clause may be afforded less protection than the Free Speech Clause, and that is indeed the effect of the Majority's ruling. I wholeheartedly disagree with that inversion of the special solicitude historically shown for the free exercise of religion. And to any who might try to obfuscate what has happened today by saying, "different doesn't mean worse," please note: courts in this Circuit and elsewhere have never questioned the First Amendment rights of corporations advancing abortion rights, *Planned Parenthood of Se. Pa. v. Casey*, 947 F.2d 682, 705-06 (3d Cir. 1991) (considering whether a statute requiring physicians to disclose certain information to women seeking abortions violated the First Amendment rights of Planned Parenthood, a corporation), *rev'd in part on other grounds*, 505 U.S. 833 (1992); *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 349 (5th Cir. 2012) (considering whether a state "restriction on promoting elective abortions" violated Planned Parenthood's First Amendment rights), while today's ruling denies First Amendment protection to one opposed to abortifacients, because that opposition is grounded in religious conviction.

Given the special place the First Amendment plays in our free society, the Supreme Court in *Bellotti* instructed that, instead of focusing on "whether corporations 'have' First

31

Amendment rights and, if so, whether they are coextensive with those of natural persons," "the question must be whether" the activity at issue falls within an area "the First Amendment was meant to protect." 435 U.S. at 776. In other words, the operative question under the First Amendment is what is being done – whether there is an infringement on speech or the exercise of religion – not on who is speaking or exercising religion. Hence, in the political speech context that it then faced, the *Bellotti* Court emphasized that, "[i]f the speakers here were not corporations, no one would suggest that the State could silence their proposed speech. It is the type of speech indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual." *Id.* at 777. Likewise here, the right to object on religious grounds to funding someone else's reproductive choices is no less legitimate because the objector is a corporation rather than an individual.

But even if it were appropriate to ignore the Supreme Court's advice and focus on the person asserting the right rather than on the right at stake, there is a blindness to the idea that an organization like a closely held corporation is something other than the united voices of its individual members. The Majority detects no irony in its adoption of the District Court's comment that "'[r]eligious belief takes shape within the minds and hearts of individuals, and its protection is one of the more uniquely human rights provided by the Constitution'" (Maj. Op. at 20-21 (quoting *Conestoga Wood Specialties Corp.*, 213 WL 140110, at *7)), while it is simultaneously denying religious liberty to Conestoga, an entity that is nothing more than the common vision of five individuals from one family who are of one heart and mind

32

about their religious belief.[17]  Acknowledging "the Hahns' commitment to the Mennonite faith" (*id.* at 30), on one hand, while on the other acting as if the Hahns do not even exist and are not having their "uniquely human rights" trampled on is more than a little jarring.

And what is the rationale for this "I can't see you" analysis?  It is that for-profit corporations like Conestoga were "created to make money." (*Id.* at 21.)  It is the profit-making character of the corporation, not the corporate form itself, that the Majority treats as decisively disqualifying Conestoga from seeking the protections of the First Amendment or RFRA.  (*See id.* at 22 ("We will not draw the conclusion that, just because courts have recognized the free exercise rights of churches and other religious entities, it necessarily follows that for-profit, secular corporations can exercise religion.").)  That argument treats the line between profit-motivated and non-profit entities as much brighter than it actually is, since for-profit corporations pursue non-profit goals on a regular basis.[18]  More important for present

---

[17] We are dealing here with a closely held corporation, and we need not determine whether or how a publicly traded corporation, with widely distributed ownership, might endeavor to exercise religion.  Those issues can be left for another day.

[18] It is commonplace for corporations to have mission statements and credos that go beyond profit maximization.  When people speak of "good corporate citizens" they are typically referring to community support and involvement, among other things.  Beyond that, recent developments in corporate law regarding "Benefit" or "B" corporations significantly undermine the narrow view that all for-profit

33

corporations are concerned with profit maximization alone. As one academic has said, "[o]n a secular level, society appears to have already recognized this, giving form to the yearning of investors, customers, employees, and officers to combine and form businesses consistent with their particular values and convictions. This is evidenced by developments both in the marketplace and in state legislatures, such as the promulgation of 'Benefit Corporation' statutes and the 'B Corporation' movement." Ronald J. Colombo, *The Naked Private Square* at 57-58, 51 Houston L. Rev. (forthcoming 2013), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2173801 &download=yes; *see also* Margaret Blair, *The Four Functions of Corporate Personhood* at 31, Public Law & Legal Theory, Working Paper No. 12-15, *available at* http://ssrn.com/abstract=2037356 (noting that corporations "support the building, preserving, and sustaining of *human institutions. …* [L]arge corporations nearly always have broader purposes than just the enrichment of shareholders, purposes such as providing safe and reliable products, good jobs for employees, new treatments for diseases, investment options for small investors, financing for housing or college, or access to communication networks that link individuals around the globe, make vast amounts of information available to them, and give them an outlet for self-expression. While investors in these institutions expect, and deserve, to get a return on their investment, profits for shareholders are clearly not the only value being created by such enterprises."); Christopher Lacovara, *Strange Creatures: A Hybrid Approach to Fiduciary Duty in Benefit Corporations*, 2011 Colum. Bus. L. Rev. 815 (discussing "[b]enefit corporations, or 'B-Corps,' [which] represent a new corporate legal form

purposes, however, the kind of distinction the majority draws between for-profit corporations and non-profit corporations has been considered and expressly rejected in other First Amendment cases.

In *Citizens United v. Federal Election Commission*, for example, the Supreme Court said, "[b]y suppressing the speech of manifold corporations, *both for-profit and nonprofit*, the Government prevents their voices and viewpoints from reaching the public and advising voters on which persons or entities are hostile to their interests." 558 U.S. at 354 (emphasis added); *see also Perry v. Los Angeles Police Dep't*, 121 F.3d 1365, 1371 (9th Cir. 1997) ("Once it is decided that the activity here is expressive activity, fully protected by the First Amendment, the fact that plaintiffs are not nonprofit organizations does not affect the level of protection accorded to their speech."); *Transp. Alts., Inc. v. City of New York*, 218 F. Supp. 2d 423, 444 (S.D.N.Y. 2002) ("[D]rawing distinctions between organizations based on for-profit or non-profit sponsorship in determining how much to charge to hold an event [in a public park] runs afoul of the First Amendment."). Because the First Amendment protects speech and religious activity generally, an entity's profit-seeking motive is not sufficient to defeat its speech or free exercise claims. *See Hobby Lobby*, 2013 WL 3216103, at

designed to accommodate the dual profit-making and public benefit goals of the social enterprise movement"). There is absolutely no evidence that Conestoga exists solely to make money. It is operated, rather, to accomplish the specific vision of its deeply religious owners. While making money is part of that vision, the government has effectively conceded that Conestoga has more than profit on its corporate agenda.

*15 ("We see no reason the Supreme Court would recognize constitutional protection for a corporation's political expression but not its religious expression.").

The forceful dissent of Judge John T. Noonan, Jr., in *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610 (9th Cir. 1988), put the point plainly:

> The First Amendment, guaranteeing the free exercise of religion to every person within the nation, is a guarantee that [for-profit corporations may] rightly invoke[]. Nothing in the broad sweep of the amendment puts corporations outside its scope. Repeatedly and successfully, corporations have appealed to the protection the Religious Clauses afford or authorize. Just as a corporation enjoys the right of free speech guaranteed by the First Amendment, so a corporation enjoys the right guaranteed by the First Amendment to exercise religion.
>
> The First Amendment does not say that only one kind of corporation enjoys this right. The First Amendment does not say that only religious corporations or only not-for-profit corporations are protected. The First Amendment does not authorize Congress to pick and choose the persons or the entities or the organizational forms that are free to exercise their religion. All persons – and under our Constitution all corporations are persons – are free. A statute cannot subtract from their freedom.

36

*Id.* at 623 (Noonan, J., dissenting) (internal citation omitted).

Oddly, the government's opposing view, adopted by the Majority, appears to be itself a species of religion, based on the idea that seeking after filthy lucre is sin enough to deprive one of constitutional protection, and taking "[t]he theological position … that human beings should worship God on Sundays or some other chosen day and go about their business without reference to God the rest of the time." *Id.* at 625. There is certainly in the text of the Constitution no support for this peculiar doctrine, and what precedent there is on the role of religion in the world of commerce is to the contrary. *See United States v. Lee*, 455 U.S. 252, 254 (1982) (allowing Amish business owner to raise a free exercise defense to his alleged failure to pay social security taxes for his employees); *Braunfeld v. Brown*, 366 U.S. 599, 601 (1961) (allowing Jewish "merchants" in Philadelphia to challenge the city's Sunday-closing laws because the laws allegedly infringed on their free exercise of religion). As the Tenth Circuit sitting en banc noted in *Hobby Lobby*, the Supreme Court's decisions establish that Free Exercise rights do not evaporate when one is involved in a for-profit business. *Hobby Lobby*, 2013 WL 3216103, at *14 (citing *Lee* and *Braunfeld*).[19]

---

[19] The government emphasizes that, in *Amos*, "the Supreme Court held that a gymnasium run by the Mormon Church was free to discharge a building engineer who failed to observe the Church's standards," but that, in so doing, "the Court stressed that the Church did not operate the gym on a for-profit basis." (Appellee's Br. at 18.) During oral argument, counsel for the government relied on that characterization of *Amos* to imply for the first time that

37

granting any free exercise rights to a for-profit corporation would inevitably trigger Establishment Clause problems, as any accommodation to the corporation would come at the expense of similarly situated corporations that had not received a religious exemption. As I have already noted, *see supra* Part III.A.1, *Amos* did not turn on a for-profit versus non-profit distinction, and, in fact, the Court left open any question regarding the Establishment Clause impact of granting a religious exemption to a for-profit corporation.

More fundamentally, the government mistakes the scope of the Establishment Clause. Under the so-called "endorsement" test for evaluating Establishment Clause challenges, courts look to "whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion." *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 592 (1989). "Of course, the word 'endorsement' is not self-defining," *id.* at 593, but the Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause," *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987); *see also Lee v. Weisman*, 505 U.S. 577, 627-28 (Souter, J., concurring) (arguing that government "may 'accommodate' the free exercise of religion by relieving people from generally applicable rules that interfere with their religious callings," without "necessarily signify[ing] an official endorsement of religious observance over disbelief"). Otherwise, the enforcement of laws that "cut[] across religious sensibilities, as [they] often do[]," would "put[] those affected to the choice of taking sides between God and government," *id.*, a choice that will often place a substantial burden on religious devotion, *see infra* Part III.A.2.a. "In

So, to recap, it is not the corporate form itself that can justify discriminating against Conestoga, and it is not the pursuit of profits that can justify it. Yet somehow, by the miracle-math employed by HHS and its lawyers, those two negatives add up to a positive right in the government to discriminate against a for-profit corporation. Thus, despite the Supreme Court's insistence that "no official, high or petty,

such circumstances, accommodating religion reveals nothing beyond a recognition that general rules can unnecessarily offend the religious conscience when they offend the conscience of secular society not at all." *Weisman*, 505 U.S. at 628. If the Supreme Court were of a contrary mind, then *Amos*, *Yoder*, *Sherbert*, and a host of other cases in which the Court granted exemptions under the Free Exercise Clause would have been decided differently.

Thus, it cannot be, as the government seems to suggest, that a decision to accommodate the Hahns' and Conestoga's constitutionally protected religious liberties would result in an impermissible endorsement of their religion. The Establishment Clause does not prohibit what the Free Exercise Clause demands. To be sure, the government may, under certain circumstances, "cross[] the line from permissible accommodation to unconstitutional establishment." *Id.* at 629 (concurring in majority holding that school-mandated prayer at graduation ceremony violated the Establishment Clause). But granting an exemption to Conestoga and the Hahns in this case would do nothing more than "lift a discernible burden on the[ir] free exercise of religion," *id.*, and "Government efforts to accommodate religion are permissible when they remove burdens on the free exercise of religion," *Cnty. of Allegheny*, 492 U.S. at 601 n.51.

can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein," *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), the government claims the right to force Conestoga and its owners to facilitate the purchase and use of contraceptive drugs and devices, including abortifacients, all the while telling them that they do not even have a basis to speak up in opposition.[20] Remarkable.

I reject that power grab and would hold that Conestoga may invoke the right to religious liberty on its own behalf.[21]

---

[20] Conestoga is silenced because it is a for-profit corporation, and the Hahns must likewise sit down and be quiet because, by the government's reasoning, the Mandate really does not affect them. (*See* Appellee's Br. at 22 (arguing that "[t]he contraceptive-coverage requirement does not compel the [Hahns] as individuals to do anything," but, rather, "[i]t is only the legally separate corporation that has any obligation under the mandate" (internal quotation marks omitted) (third alteration in original)).)

[21] Because of that conclusion, I need not consider at length the alternative argument that, even if Conestoga itself is without First Amendment protection, it may assert the free exercise claims of its owners, the Hahns. Suffice it to say that there is persuasive precedent for that approach in the context of close corporations. *See Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 200 (2d Cir. 2012) (allowing a kosher deli to press Free Exercise and Establishment Clause claims on behalf of its owners); *Stormans Inc. v. Selecky*, 586 F.3d 1109, 1120 & 1120 n.9

(9th Cir. 2009) ("We have held that a corporation has standing to assert the free exercise right of its owners. … [A]n organization that asserts the free exercise rights of its owners need not be primarily religious … ."); *Townley*, 859 F.2d at 620 n.15 (holding that "it is unnecessary to address the abstract issue whether a for profit corporation has rights under the Free Exercise Clause independent of those of its shareholders and officers" because the corporation in question "presents no rights of its own different from or greater than its owners' rights," and allowing the corporation "standing to assert [its owners'] Free Exercise rights"); *Tyndale House Publishers, Inc. v. Sebelius*, 504 F. Supp. 2d 106, 116 (D.D.C. 2012) ("[T]he beliefs of Tyndale and its owners are indistinguishable."); *Legatus v. Sebelius*, 901 F. Supp. 2d 980, 988 (E.D. Mich. 2012) ("For the purposes of the pending motion, however, Weingartz Supply Co. may exercise standing in order to assert the free exercise rights of its president, Daniel Weingartz, being identified as 'his company.'"); *State ex rel. McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 850-51 (Minn. 1985) (holding that a "conclusory assertion that a corporation has no constitutional right to free exercise of religion is unsupported," and allowing a free exercise claim because the corporation's owners "are the ones asserting the first amendment right to the free exercise of religion").

The Majority forecloses that line of argument, insisting that, although "[t]he corporate form offers several advantages 'not the least of which was limitation of liability,' … the shareholder must give up some prerogatives" in return (Maj. Op. at 27), including, apparently, his religious convictions. That conclusion rests on a mistaken idea that the business purposes for which corporate law has developed and that

41

2. *The Appellants' RFRA Claim*

Turning to the merits of the Appellants' RFRA claim, I am satisfied that both Conestoga and the Hahns have shown a likelihood of success. RFRA has been called the "most important congressional action with respect to religion since the First Congress proposed the First Amendment," Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious Freedom Restoration Act*, 73 Tex. L. Rev. 209, 243 (1994), and it exists specifically to provide heightened protection to the free exercise of religion. The statute was produced by an "extraordinary ecumenical coalition in the Congress of liberals and conservatives, Republicans and Democrats, Northerners and Southerners, and in the country as a whole, a very broad coalition of groups that have traditionally defended … the various religious faiths … as well as those who champion the cause of civil liberties." *Religious Freedom Restoration Act of 1990: Hearing Before the*

_____

underpin the legal fiction of a corporation being separate from its owners must mean that the people behind the corporate veil are to be ignored for all purposes. That notion breezes past the very specific business objectives for which the corporate veil exists, namely, "to facilitate aggregations of capital," *Entel v. Guilden*, 223 F. Supp. 129, 131 (S.D.N.Y. 1963), and "to limit or eliminate the personal liability of corporate principals," *Goldman v. Chapman*, 844 N.Y.S.2d 126, 127 (N.Y. App. Div. 2007). Nothing in the history of the important doctrine of a corporation's separate identity justifies the limitation on civil rights that the Majority endorses. *See Hobby Lobby*, 2013 WL 3216103, at *27 (Hartz, J., concurring) ("What does limiting financial risk have to do with choosing to live a religious life?").

*Subcomm. On Civil & Constitutional Rights of the H. Comm. on the Judiciary*, 101st Cong. 13 (1991) (statement of Rep. Solarz, chief sponsor of H.R. 5377).

Those diverse voices came together in response to the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), in which, while upholding a law that banned the use of peyote even for sacramental purposes, the Court held that the First Amendment's Free Exercise Clause does not require judges to engage in a case-by-case assessment of the religious burdens imposed by facially constitutional laws. *Id.* at 883-90. Congress quickly decried *Smith* as having "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S.C. § 2000bb(a)(4). The stringent standard of review imposed by RFRA on government action reflects Congress's judgment that "governments should not substantially burden religious exercise without compelling justification." *Id.* § 2000bb(a)(3). It is intended "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) … in all cases where free exercise of religion is substantially burdened" by the Federal government, *id.* § 2000bb(b)(1),[22] and we are to look to pre-*Smith* free

---

[22] Although the Supreme Court held RFRA unconstitutional as applied to state and local governments because it exceeded Congress' power under § 5 of the Fourteenth Amendment, *see City of Boerne v. Flores*, 521 U.S. 507 (1997), it "continues to apply to the Federal Government," *Sossamon v. Texas*, __ U.S. __, 131 S. Ct. 1651, 1656 (2011).

exercise jurisprudence in assessing RFRA claims, *see Vill. of Bensenville v. FAA*, 457 F.3d 52, 62 (D.C. Cir. 2006).

In short, RFRA restores the judicial standard of review known as "strict scrutiny," which is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The statute prohibits the Federal government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability,"[23] *id.* § 2000bb-1(a), except when the

---

[23] Having determined (erroneously) that corporations, even closely held ones, do not enjoy religious liberty, the Majority declined to "decide whether such a corporation is a 'person' under the RFRA." (Maj. Op. at 28-29.) I believe that it is. Although the statute itself does not define "person," the fallback definition section in the United States Code provides that "unless the context indicates otherwise … the word[] 'person' … include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals … ." 1 U.S.C. § 1; *see also Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1707 (2012) (explaining that the word "person" often includes corporations, and that Congress and the Supreme Court often use the word "individual" "to distinguish between a natural person and a corporation"); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 687 (1978) ("[B]y 1871, it was well understood that corporations should be treated as natural persons for virtually all purposes of constitutional and statutory analysis."). Given that corporations can assert religious exercise claims, *see supra* Part III.A.1, the District Court erred in concluding that "context indicates" that a for-profit corporation is not a "person" for purposes of RFRA.

44

government can "demonstrat[e] that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest," *id.* § 2000bb-1. The term "exercise of religion" "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A), *incorporated by* 42 U.S.C. § 2000bb-2(4). A person whose religious practices are burdened in violation of RFRA "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief." *Id.* § 2000bb-1(c).

a.    *Substantial Burden*

Under RFRA, "a rule imposes a substantial burden on the free exercise of religion if it prohibits a practice that is both sincerely held by and rooted in the religious beliefs of the party asserting the claim." *United States v. Ali*, 682 F.3d 705, 710 (8th Cir. 2012) (internal quotation marks omitted). Within the related context of the Religious Land Use and Institutionalized Persons Act of 2000, a "substantial burden" exists where: (1) "a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other [persons] versus abandoning one of the precepts of his religion in order to

---

*Conestoga Wood Specialties Corp.*, 2013 WL 140110, at *10. *See generally Hobby Lobby*, 2013 WL 3216103, at *12 ("[T]he government has given us no persuasive reason to think that Congress meant 'person' in RFRA to mean anything other than its default meaning in the Dictionary Act – which includes corporations regardless of their profit-making status.").

receive a benefit"; or (2) "the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007).

The substantial burden test derives from the Supreme Court's decisions in *Sherbert* and *Yoder*. In *Sherbert*, the Court held that a state's denial of unemployment benefits to a Seventh-Day Adventist for refusing to work on Saturdays substantially burdened the exercise of her religious belief against working on Saturdays. The state law at issue in that case

> force[d] her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

*Sherbert*, 374 U.S. at 404. And in *Yoder* the Court held that a compulsory school attendance law substantially burdened the religious exercise of Amish parents who refused to send their children to high school. The burden in *Yoder* was a fine of between five and fifty dollars. The Court held that burden to be "not only severe, but inescapable," requiring the parents "to perform acts undeniably at odds with fundamental tenets of their religious belief." *Yoder*, 406 U.S. at 218.

46

The District Court here failed to appreciate the applicability of those precedents. It held, for two reasons, that the burden imposed by the Mandate on Conestoga and the Hahns was insubstantial. First, it said that Conestoga, as a for-profit corporation, lacks religious rights and so can suffer no burden on them, and, relatedly, that any harm to the Hahns' religious liberty is "too attenuated to be substantial" because it is Conestoga, not they, that must face the Mandate. *Conestoga Wood Specialties Corp.*, 2013 WL 140110, at \*12; *see also id.* at \*14 ("Conestoga's corporate form … separates the Hahns from the requirements of the ACA, as the Women's Preventive Healthcare regulations apply only to Conestoga, a secular corporation without free exercise rights, not the Hahns. Whatever burden the Hahns may feel from being involved with a for-profit corporation that provides health insurance that could possibly be used to pay for contraceptives, that burden is simply too indirect to be considered substantial under the RFRA."). That line of argument is fallacious, for the reasons I have just discussed and will not repeat. *See supra* Part III.A.1.

Relying on the recently reversed panel decision in *Hobby Lobby*, the District Court's second line of argument was that "the Hahns have not demonstrated that [the Mandate] constitute[s] a substantial burden upon their religion," *Conestoga Wood Specialties Corp.*, 2013 WL 140110, at \*12, because "the ultimate and deeply private choice to use an abortifacient contraceptive rests not with the Hahns, but with Conestoga's employees," *id.* at \*13. As the District Court saw it, "any burden imposed by the regulations is too attenuated to be considered substantial" because "[a] series of events must first occur before the actual use of an abortifacient would come into play," including that "the

payment for insurance [must be made] to a group health insurance plan that will cover contraceptive services …; the abortifacients must be made available to Conestoga employees through a pharmacy or other healthcare facility; and a decision must be made by a Conestoga employee and her doctor, who may or may not choose to avail themselves to these services." *Id.* at \*14. "Such an indirect and attenuated relationship," the Court held, "appears unlikely to establish the necessary substantial burden." *Id.* at \*12 (quoting *Hobby Lobby*, No. 12-6294, slip op. at 7, *rev'd en banc*, __ F.3d __, 2013 WL 3216103 (10th Cir. 2013)) (internal quotation marks omitted).

The problem with that reasoning is that it fundamentally misapprehends the substance of the Hahns' claim. As the Seventh Circuit rightly pointed out when granting an injunction in the Mandate case before it, "[t]he religious-liberty violation at issue here inheres in the *coerced coverage* of contraception, abortifacients, sterilization, and related services, *not* – or perhaps more precisely, *not only* – in the later purchase or use of contraception or related services." *Korte v. Sebelius*, No. 12-3841, 2012 WL 6757353, at \*3 (7th Cir. Dec. 28, 2012); *see also Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 123 (D.D.C. 2012) ("Because it is the coverage, not just the use, of the contraceptives at issue to which the plaintiffs object, it is irrelevant that the use of the contraceptives depends on the independent decisions of third parties."); *Grote Indus., LLC v. Sebelius*, __ F. Supp. 2d __, 2012 WL 6725905, at \*6 (S.D. Ind. Dec. 27, 2012) ("We acknowledge that Plaintiffs object not just to the *use* of contraceptives, but to the *coverage* itself."). In requiring them to provide the offending insurance coverage, the Mandate requires the Hahns and Conestoga to

48

take direct actions that violate the tenets of their Mennonite faith, with the threat of severe penalties for non-compliance. They face the "inescapable choice" between facilitating the provision of "drugs and services that they believe are immoral (and thereby commit[ting] an immoral act)," or "suffer[ing] severe penalties for non-compliance with the Mandate." (Appellants' Opening Br. at 26-27.) As explained in *Sherbert* and *Yoder*, religious exercise is substantially burdened by a law that puts substantial pressure on a person to commit an act discouraged or forbidden by that person's faith, and the Hahns' Mennonite faith forbids them not only from using certain contraceptives, but from paying for others to use them as well. *Cf. United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 629 (7th Cir. 2000) ("The Free Exercise Clause … provides considerable … protection for the ability to practice (through the performance or non-performance of certain actions) one's religion.").

Even if Conestoga's and the Hahns' only religious objection were the ultimate use of the offending contraceptives by Conestoga employees, however, the fact that the final decision on use involves a series of sub-decisions does not render the burden on their religious exercise insubstantial. Nothing in RFRA suggests that indirect pressure cannot violate the statute. *See* 42 U.S.C. § 2000bb-1(a) (prohibiting not "direct" burdens, but "substantial" ones). Indeed, even though a burden may be characterized as "indirect," "the Supreme Court has indicated that indirectness is not a barrier to finding a substantial burden." *Tyndale*, 904 F. Supp. 2d at 123. The claimant in *Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707 (1981), quit his job because, based on his religious beliefs, he could not work in a factory that

49

produced tank turrets. The state denied him unemployment benefits and argued that his objection was unfounded because he had been willing to work in a different factory that produced materials that might be used for tanks. The Supreme Court held that, in determining whether Thomas's religious beliefs were burdened, it could not second-guess his judgment about what connection to armament production was unacceptably close for him: "Thomas drew a line, and it is not for us to say that the line he drew was an unreasonable one." *Id.* at 715. "While the compulsion may be indirect," the Court reasoned, "the infringement upon free exercise is nonetheless substantial." *Id.* at 718. The Court further instructed that "[c]ourts should not undertake to dissect religious beliefs" when analyzing substantial burden questions. *Id.* at 715. The Appellants here are entitled, just as much as Thomas was, to make judgments about when their connection with the acquisition and use of contraceptives becomes close enough to contravene their faith.

Moreover, if the indirectness of the ultimate decision to use contraceptives truly rendered insubstantial the harm to an employer, then no exemptions to the Mandate would be necessary. The harm to the Catholic Church by one of its employees' decision to use an abortifacient would be equally as indirect, and, by the District Court's logic, would pose equally as insubstantial a burden on the Church's free exercise rights. But the Mandate does provide an exemption for so-called "religious employers," *see supra* note 16, and the regulation itself thus allows that an employee's choice that only indirectly affects an employer can result in substantial harm to the employer.[24]

_____

[24] The same logic applies to the District Court's

It is true, as the Supreme Court cautioned in *United States v. Lee*, that "every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs. When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." 455 U.S. at 261. But even in *Lee*, the Court held that the requirement to pay Social Security taxes substantially burdened a for-profit Amish employer's religious exercise.[25] The Court held that,

statement that there is no difference to employers if, on one hand, their employees purchase contraceptives with salary or, on the other, they obtain them free of charge through company-provided health insurance. *Conestoga Wood Specialties Corp.*, 2013 WL 140110, at \*13; *see also Autocam*, No. 1:12-cv-1096, slip op. at 11 (noting that plaintiffs will be "paying indirectly for the same services through wages" that their employees may choose to use "for contraception products and services"). If that were the case, no exemptions would be required, even for religious employers. In a free society, there is a world of difference between paying money with no strings attached as compensation for an employee's work and being forced to fund insurance coverage that expressly provides for goods and services believed to be morally reprehensible.

[25] The Supreme Court in *Lee* did not use the phrase "substantial burden," but, since *Lee*, the Court has consistently described its holding in that case as establishing that the government may substantially burden religious exercise only if it can show that the regulation in question

51

"[b]ecause the payment of the taxes or receipt of benefits violates Amish religious beliefs, compulsory participation in the social security system interferes with their free exercise rights." *Id.* at 257. Although the Court held that religious adherents who enter the commercial marketplace do not have an absolute right to receive a religious exemption from all legal requirements that conflict with their faith, *id.* at 261, the fact that the Court concluded that there was a substantial burden and proceeded to apply strict scrutiny illustrates that the government does not have *carte blanche* to substantially burden the religious exercise of for-profit corporations and their owners.

Thus, I would hold that the District Court erred in concluding that the Mandate does not substantially burden Conestoga's and the Hahns' free exercise of religion.

b. *Strict Scrutiny*

If government action "substantially burdens" religious exercise, it will be upheld under RFRA only if it "is in furtherance of a compelling governmental interest," and "is

---

satisfies strict scrutiny − that is, that the regulation furthers a compelling governmental interest in the least restrictive means possible. In *Hernandez v. Commissioner*, 490 U.S. 680 (1989), for example, the Court described the holding in *Lee* in the following manner: "[O]ur decision in *Lee* establishes that *even a substantial burden* would be justified by the 'broad public interest in maintaining a sound tax system,' free of 'myriad exceptions flowing from a wide variety of religious beliefs.'" *Id.* at 699-700 (quoting *Lee*, 455 U.S. at 260) (emphasis added).

the least restrictive means" of accomplishing that interest. 42 U.S.C. § 2000bb-1. Neither the Majority nor the District Court addressed that strict scrutiny test, because they disposed of the case on other grounds. The Supreme Court has said that strict scrutiny must not be "'strict in theory, but fatal in fact.'" *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995). And it has recently noted that "the opposite is also true": "[s]trict scrutiny must not be strict in theory but feeble in fact." *Fisher v. Univ. of Texas at Austin*, slip op. at 13, 570 U.S. __ (2013). Only the feeblest application of strict scrutiny could result in upholding the Mandate on this record.

### i. *Compelling Interest*

Compelling interests are those "of the highest order," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993), or "paramount interests," *Thomas v. Collins*, 323 U.S. 516, 530 (1945). The government maintains that the Mandate advances two compelling governmental interests: "public health and gender equality." (Appellee's Br. at 34.) In particular, it states that the "health services at issue here relate to an interest – a woman's control over her procreation – that is so compelling as to be constitutionally protected from state interference." (Appellee's Br. at 34-35.)

Preserving public health and ending gender discrimination are indeed of tremendous societal significance. The government can certainly claim "a compelling interest in safeguarding the public health by regulating the health care and insurance markets." *Mead v. Holder*, 766 F. Supp. 2d 16, 43 (D.D.C. 2011). And, as it is of undoubted "importance, both to the individual and to society, [to] remov[e] the

53

barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984), there is a compelling interest in "[a]ssuring women equal access to … goods, privileges, and advantages" enjoyed by men, *id.*

Assuming for the sake of discussion that the Mandate may actually advance those interests, it must nevertheless be observed that the mere "invocation" of a "general interest in promoting public health and safety [or, for that matter, gender equality] … is not enough" under RFRA. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 438 (2006). The government must show that the application of the Mandate to the Hahns and Conestoga in particular furthers those compelling interests. 42 U.S.C. § 2000bb-1(b)(1); *see Tyndale*, 904 F. Supp. 2d at 125 (providing that the government "must show that requiring [appellants] to provide the contraceptives to which they object … will further the government's compelling interests in promoting public health and in providing women equal access to health care"); *see also O Centro*, 546 U.S. at 430 ("RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' – the particular claimant whose sincere exercise of religion is being substantially burdened." (quoting 42 U.S.C. § 2000bb-1(b))). Courts are required to "look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431; *see also Yoder*, 406 U.S. at 236 ("[I]t was incumbent on the State to show with more particularity how its admittedly strong interest in compulsory

education would be adversely affected by granting an exemption to the Amish."). The government must "offer[] evidence that granting the requested religious accommodations would seriously compromise its ability to administer" its contraceptive Mandate. *O Centro*, 546 U.S. at 435. It has failed to do that.

The government's arguments against accommodating the Hahns and Conestoga are "undermined by the existence of numerous exemptions [it has already made] to the … mandate." *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1297 (D. Colo. 2012). By its own choice, the government has exempted an enormous number of employers from the Mandate, including "religious employers" who appear to share the same religious objection as Conestoga and the Hahns, leaving tens of millions of employees and their

families untouched by it.[26]  "[A] law cannot be regarded as protecting an interest of the highest order when it leaves

---

[26] The sheer number of employers exempted from the Mandate distinguishes this case from *United States v. Lee*.  In that case, the Supreme Court held that, although the "compulsory participation in the social security system interfere[d] with [the plaintiff Amish employer's] free exercise rights," 455 U.S. at 257, the social security system nonetheless satisfied strict scrutiny as applied to the Amish employer, regardless of Congress's having exempted from social security taxes "self-employed members of other religious groups with similar beliefs," *id.* at 255 (citation omitted).  As the Court described it, that provision exempted only a "narrow category" of "[s]elf-employed persons" who are members of "a religious community" that, like the Amish, "ha[s] its own 'welfare' system," *id.* at 261, a small group to say the least.

By way of comparison, the Supreme Court held in *O Centro* that the government had failed to make a showing that a ban on the use of a hallucinogenic substance served a compelling interest as applied to a Native American tribe that used the substance as part of its religious services.  546 U.S. at 439.  The Court relied heavily on similar religious exemptions granted with respect to the use of peyote by "hundreds of thousands" of members of the Native American Church, and found that such broad exemptions weighed heavily against finding a compelling interest.  *Id.* at 433-34.

With respect to the Mandate, as a result of the multiple and wide-reaching exemptions, millions of individuals – perhaps upwards of 190 million, *see Newland*, 881 F. Supp. 2d at 1298 ("The government has exempted over 190 million health plan participants … from the preventive care coverage

56

appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye*, 508 U.S. at 547 (alteration and internal quotation marks omitted). So, when the government's proffered compelling interest applies equally to employers subject to a law and those exempt from it, "it is difficult to see how [the] same findings [supporting the government's interest] alone can preclude any consideration of a similar exception" for a similarly situated plaintiff. *O Centro*, 546 U.S. at 433; *see also Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (noting that the purpose of a law is undermined when it is "so woefully underinclusive as to render belief in [its] purpose a challenge to the credulous"). The Mandate is a classic example of such arbitrary underinclusiveness. It cannot legitimately be said to vindicate a compelling governmental interest because the government has already exempted from its reach grandfathered plans, employers with under 50 employees, and what it defines as "religious employers" (*see* Maj. Op. at 12 n.4), thus voluntarily allowing millions upon millions of people – by some estimates 190 million – to be covered by insurance plans that do not satisfy the supposedly vital interest of providing the public with free contraceptives. *See Geneva Coll. v. Sebelius*, No. 12-cv-00207, 2013 WL 3071481, at *10 (W.D. Pa. June 18, 2013) ("In light of the myriad exemptions to the mandate's requirements already granted, the requirement is woefully underinclusive and therefore does not serve a compelling government interest." (internal quotation marks omitted)).

---

mandate.") – will fall outside the government's interest in increasing access to contraceptives. This case is thus even further removed than *O Centro* from the narrow exemption involved in *Lee*.

ii.      *Least Restrictive Means*

Nor can the government affirmatively establish that the Mandate is the least restrictive means of advancing its interests in health and gender equality.  Statutes fail the "least restrictive means" test when they are "overbroad" or "underinclusive."  *Church of the Lukumi Babalu Aye*, 508 U.S. at 546.  The underinclusiveness here is manifest, as just described.  Moreover, the least restrictive means test is aimed at uncovering "the extent to which accommodation of the [plaintiff] would impede the state's objectives," and "[w]hether the state has made this showing depends on a comparison of the cost to the government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity."  *S. Ridge Baptist Church v. Indus. Comm'n*, 911 F.2d 1203, 1206 (6th Cir. 1990) (internal quotation marks omitted).  If the government "has open to it a less drastic way of satisfying its legitimate interests, it may not choose a [regulatory] scheme that broadly stifles the exercise of fundamental personal liberties."  *Anderson v. Celebrezze*, 460 U.S. 780, 806 (1983) (internal quotation marks omitted).

The Hahns and Conestoga argue that the government could directly further its interest in providing greater access to contraception without violating their religious exercise by, for example,

> (1) offer[ing] tax deductions or credits for the purchase of contraceptive services; (2) expand[ing] eligibility for already existing

58

federal programs that provide free contraception; (3) allow[ing] citizens who pay to use contraceptives to submit receipts to the government for reimbursement; or (4) provid[ing] incentives for pharmaceutical companies that manufacture contraceptives to provide such products to pharmacies, doctor's offices, and health clinics free of charge.

(Appellants' Opening Br. at 51.) In response, the government argues that the Appellants misunderstand the least-restrictive-means test and that their proposed alternatives "would require federal taxpayers to pay the cost of contraceptive services for the employees of for-profit, secular companies." (Appellees' Br. at 40.)

It is the government that evidently misunderstands the test, for while the government need not address every conceivable alternative, it "must refute the alternative schemes offered by the challenger," *United States v. Wilgus*, 638 F.3d 1274, 1288-89 (10th Cir. 2011),[27] ultimately settling on a policy that is "necessary" to achieving its compelling goals, *Fisher*, slip op. at 10, 570 U.S. __. And it must seek out religiously neutral alternatives before choosing policies that impinge on religious liberty. *Cf. Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002) ("The Government

---

[27] As the Tenth Circuit said in *Wilgus*, the government need not "refute each and every conceivable alternative regulation scheme." *Wilgus*, 638 F.3d at 1289. But it "must support its choice of regulation, and it must refute the alternative schemes offered by the challenger" – "both through the evidence presented in the record." *Id.*

simply has not provided sufficient justification here. If the First Amendment means anything, it means that regulating speech must be a last – not first – resort. Yet here it seems to have been the first strategy the Government thought to try."). In those responsibilities, the government has utterly failed. It has made no showing that any of the Appellants' alternative ideas would be unworkable. *Cf. Fisher*, slip op. at 11, 570 U.S. __ (stating, in the context of racial preferences, that "[t]he reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce the … benefits" sought). In fact, the government already provides free contraception to some women, and there has been no showing that increasing the distribution of it would not achieve the government's goals. Because the government has not refuted that it could satisfy its interests in the wider distribution of contraception through any or all of the means suggested by Conestoga and the Hahns, without burdening their rights to religious liberty, the government has not shown that the Mandate is the least restrictive means of addressing those interests. It may be that the government's political interests are better satisfied by forcing the Hahns to the pharmacy counter than by trying to persuade voters to support other means to fund free contraceptives, but political expediency is not synonymous with "least restrictive means."

Accordingly, the government has not met the burdens of strict scrutiny, and I would hold that Conestoga and the Hahns have established a likelihood of succeeding on the merits of their RFRA claim.

### 3. *The Appellants' First Amendment Claim*

Conestoga and the Hahns also bring a separate claim

60

under the First Amendment. As previously discussed, the Supreme Court in *Smith* held that the Free Exercise Clause is not implicated when the government burdens a person's religious exercise through laws that are neutral and generally applicable. 494 U.S. at 879. In contrast, "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye*, 508 U.S. at 546. "Neutrality and general applicability are interrelated, and … failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531.

In my view, the Mandate is not generally applicable, and it is not neutral. "A law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004). Here, as already noted, the government has provided numerous exemptions, large categories of which are unrelated to religious objections, namely, the exemption for grandfathered plans and the exemption for employers with less than 50 employees. And it seems less than neutral to say that some religiously motivated employers – the ones picked by the government – are exempt while others are not.[28] Finally, it is utterly arbitrary to say that religious liberties depend on whether a company hires 49 or 50 employees.

---

[28] Because I have already discussed the "non-profit versus for-profit" distinction at length, *see supra* Part III.A.1, I will not repeat my reasons for rejecting it in this context.

Under the First Amendment, therefore, the Mandate is to be subjected to strict scrutiny. As discussed above in relation to the RFRA claim brought by Conestoga and the Hahns, *see supra* Part III.A.2.b, the Mandate does not pass that daunting test, and, accordingly, they have demonstrated a reasonable likelihood of succeeding on their First Amendment claim.

### B. *Irreparable Harm*

Focusing only on the question of likelihood of success on the merits, neither the District Court nor the Majority evaluated whether Conestoga and the Hahns have demonstrated irreparable harm. It is a painful topic to confront, as it brings to the fore the immediate and unconscionable consequences of the government's overreaching.

"Irreparable harm is injury for which a monetary award cannot be adequate compensation." *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996) (internal quotation marks omitted). "It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (alteration in original). In fact, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995). That principle applies with equal force to a violation of RFRA because RFRA enforces First Amendment freedoms. *See Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) ("[C]ourts have

held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("Courts have persuasively found that irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA." (citations omitted)).  Threats to First Amendment rights are often seen as so potentially harmful that they justify a lower threshold of proof to show a likelihood of success on the merits. *Playboy Entm't Grp., Inc. v. United States*, 945 F. Supp. 772, 783 (D. Del. 1996) ("In a case … in which the alleged injury is a threat to First Amendment interests, the finding of irreparable injury is often tied to the likelihood of success on the merits."), *aff'd*, 520 U.S. 1141 (1997).

Because the government demanded that the Hahns and Conestoga capitulate before their appeal was even heard,[29] and because the District Court denied preliminary injunctive relief, the severe hardship has begun.  (*See* Maj. Op. at 13 (noting that "Conestoga is currently complying with the Mandate").)  Faced with ruinous fines, the Hahns and Conestoga are being forced to pay for the offending

---

[29] Given the government's recent decision to delay the implementation of other aspects of the ACA, *see* Zachary A. Goldfarb & Sandhya Somashekhar, *White House Delays Health-Care Rule that Businesses Provide Insurance to Workers*, Washington Post, July 2, 2013, *available at* http://www.washingtonpost.com/politics/white-house-delays-health-care-rule-that-businesses-provide-insurance-to-workers/2013/07/02/f87e7892-e360-11e2-aef3-339619eab080_story.html, one wonders why it could not give religious believers some breathing room during court consideration of the Mandate.

contraceptives, including abortifacients, in violation of their religious convictions, and every day that passes under those conditions is a day in which irreparable harm is inflicted. *See Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). The Majority's ruling guarantees that grievous harm will go on and, as the days pile up, worsen. *See Conestoga Wood Specialties Corp. v. U.S. Dep't of Health & Human Servs.*, No. 13-1144, 2013 WL 1277419, at *6-*11 (3d Cir. Jan. 29, 2013) (Jordan, J., dissenting).

C.      *The Remaining Injunction Factors*

Conestoga and the Hahns have also met the remaining preliminary injunction factors. A preliminary injunction would not result in greater harm to the government but would merely restore the status quo between the parties. "One of the goals of the preliminary injunction analysis is to maintain that status quo, defined as the last, peaceable, noncontested status of the parties." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (alteration and internal quotation marks omitted). The last uncontested status between the parties was prior to January 1, 2013, the date the Mandate became effective against the Appellants. "Granting an injunction would restore that state of affairs." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990). Moreover, the harm to Conestoga and the Hahns caused by the denial of the preliminary injunction vastly outweighs the harm to the government were an injunction to be granted. Again, any infringement on a person's First Amendment rights – even if only for a short time – constitutes irreparable injury. *See Elrod*, 427 U.S. at

64

373. Although a preliminary injunction in this case might "temporarily interfere[] with the government's goal of increasing cost-free access to contraception and sterilization," that interest "is outweighed by the harm to the substantial religious-liberty interests on the other side." *Korte v. Sebelius*, No. 12-3841, 2012 WL 6757353, at *5 (7th Cir. Dec. 28, 2013); *see also Monaghan v. Sebelius*, __ F. Supp. 2d __, 2012 WL 6738476, at *8 (E.D. Mich. Dec. 30, 2012) ("The harm of delaying the implementation of a statute that may later be deemed constitutional is outweighed by the risk of substantially burdening the free exercise of religion.").

In addition, a preliminary injunction would not harm the public interest. On the contrary, "[a]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). And "[t]he public as a whole has a significant interest in ensuring … [the] protection of First Amendment liberties." *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009). An injunction would simply put Conestoga's employees in the same position as the tens of millions of employees and their families whose employers have already been exempted from the Mandate.

## IV.   Conclusion

This is a controversial and, in some ways, complex case, but in the final analysis it should not be hard for us to join the many courts across the country that have looked at the Mandate and its implementation and concluded that the government should be enjoined from telling sincere believers

in the sanctity of life to put their consciences aside and support other people's reproductive choices. The District Court's ruling should be reversed and a preliminary injunction should issue.